**TEXAS ALARM AND SIGNAL ASSOCIATION, Appellant,**

v.

**The PUBLIC UTILITY COMMISSION of Texas et al., Appellees.**

No. B–8620.

Supreme Court of Texas.

March 26, 1980.

Rehearing Denied April 30, 1980.

---

adjust and increase its rates.[1] Texas Alarm and Signal Association, appellant in this direct appeal, intervened and participated in the Commission proceedings. In due time after conducting extensive public hearings, the Commission authorized Bell to increase its overall revenues by $124,539,000 and to adjust its rate structure accordingly. Texas Alarm and Signal Association then filed suit in the district court against the Commission and sought to set aside the Commission's order. Bell intervened in the district court. The district court sustained the Commission's order and Texas Alarm and Signal Association has brought this direct appeal. We affirm the judgment of the district court.

Texas Alarm and Signal Association (TASA) is an incorporated association of individual alarm companies which provide alarm services to individuals and businesses. To provide this alarm service, these companies place detection devices on the protected premises. These detection devices transmit signals to the alarm companies' monitoring stations. The signals from the detection device to the monitoring stations are transmitted over Bell's facilities. In their rate structure, Bell classifies this type of service as private line and these tariffs were increased by the order of Public Utility Commission.

The question to be decided in this direct appeal does not concern the overall revenue requirements of Bell, i. e., whether the Commission used the proper rate base as was the issue in *Southwestern Bell Telephone Co. v. Public Utility Commission*, 571 S.W.2d 503 (Tex.1978); or whether the Commission has allowed a reasonable rate of return. The rate structure authorized by the order of the Commission is the subject of TASA's complaint.

In the Commission proceedings, Bell sought an increase in overall revenues totaling $214,317,000. Bell distributed this increase in revenue requirement among the

McGinnis, Lochridge & Kilgore, Earnest Casstevens, Austin, for appellant.

Mark White, Atty. Gen., Stuart Fryer, Asst. Atty. Gen., Austin, Jon Dee Lawrence and Rebecca S. Bain, Dallas, for appellees.

STEAKLEY, Justice.

This is a rate structure case reaching us by direct appeal. *See* Tex.Rev.Civ.Stat. Ann. art. 1738a; Tex.R.Civ.P. 499a. The case originated in a petition filed by Southwestern Bell Telephone Company with the Public Utility Commission for authority to

---

1. The petition was a part of a rate filing package that consisted of a statement of intent, of proposed revised tariffs, and of prefiled testimony and exhibits which supported Bell's position.

various services.[2] Bell projected that the proposed rate structure would generate increased revenues from each class as follows:

| | | |
|---|---|---|
| Long Distance | $ | 0 |
| WATS | | 0 |
| Coin | | 0 |
| Directory Assistance Charging | | 0 |
| Service Connection Moves & Changes | | 25,232,000 |
| Key Telephone | | 17,939,000 |
| Miscellaneous Equipment | | 13,534,000 |
| Private Branch Exchange (PBX) | | 13,641,000 |
| Centrex | | 10,348,000 |
| Private Line | | 19,069,000 |
| Touch-Tone (R) | | (647,000) |
| Other | | 5,014,000 |
| Local Gross Receipts Charge | | 33,728,000 |
| Local Exchange | | 76,459,000 |
| TOTAL | | $214,317,000 |

The Commission determined that Bell was entitled to $124,539,000 in increased revenue and the Commission's rate structure resulted in the following projected increase from each service:

| | | |
|---|---|---|
| Long Distance | $ | 0 |
| WATS | | 0 |
| Coin | | 0 |
| Directory Assistance Charging | | 0 |
| Service Connection Moves & Changes | | 25,232,000 |
| Key Telephone | | 17,930,000 |
| Miscellaneous Equipment | | 13,524,000 |
| Private Branch Exchange (PBX) | | 6,600,000 |
| Centrex | | 6,488,000 |
| Private Line | | 19,078,000 |
| Touch-Tone (R) | | (647,000) |
| Other | | 4,598,000 |
| Local Gross Receipts Charge Tariffs | | 31,736,000 |
| Local Exchange | | 0 |
| TOTAL | | $124,539,000 |

The Commission concluded that "[t]he rate design as set out in the Findings of Fact herein is reasonable and is not unreasonably discriminatory, prejudicial, or preferential and shall be adopted by this Or-

der." Finding of Fact 30 discloses the Commission's rate structure and it states in part:

Rate Structure. In general the rate structure proposed by SWB are based on sound ratemaking principles and are compatible with the rate design philosophy adopted by the Commission in earlier cases, and such rate structures are sufficient, equitable, consistent in application to each class of customers, are not unreasonable, preferential, prejudicial, or discriminatory, and will produce the proportionate part of the required revenues to eliminate SWB's revenue deficit. The value of service concept in the telephone industry is a historical concept widely accepted as a proper pattern for rate design and should not be discarded by the Commission without concrete cost data to support such change at this time. The value of service concept contemplates that universal telephone service is desirable and that the basic local residential and business rates should be kept at a minimum level consistent with the concept that the company earn a fair rate of return on its invested capital; therefore, the Commission adopts the residual ratemaking principles proposed by the company except as changed herein.

a. After due consideration of the cost studies submitted by the company, the evidence and testimony of the staff and each of the intervenors, and the impact of rate changes in each class of customers, the Commission finds that the following revenue allocation is reasonable and equitable and will produce $124,539,000 in additional revenues . . . .

In the Commission's proceedings, witnesses for the Commission staff, and intervenors such as TASA testified about Bell's proposed tariff. Among other criticisms of

2. The distribution of the revenue requirements among the various services is called rate design. Ordinarily a utility will determine its overall revenue requirements and will then set the tariff or price for each class at a level which will achieve a fraction of the revenue requirements. The resulting price schedule is called

the rate structure or rate schedule. The rate structure as a whole is intended to produce the overall revenue requirements of the utility. *See* Garfield and Lovejoy, Public Utility Economics at 45 (1964); *Rate Design*, 28 Baylor L.Rev. 1083 (1976).

the private line tariff, these witnesses argued that the rates for private line should remain distance sensitive. That is, rather than charge a flat rate for the service, as Bell proposed, Bell should charge a rate based on the distance between the two points being serviced. With regard to this distance sensitive rate, these witnesses stated that rates should be in quarter mile increments and any fraction of a mile should be rounded to the next quarter mile. Witnesses also pointed out that Bell's proposed rates gave Bell the right to realign the boundaries of its serving offices without Commission approval and allowed Bell to offer Type 102 private line service "by either metallic channels or by other means at the telephone company's option." Each of these tariffs and powers affected the private line users, and their witnesses testified that Bell should not be given these options. As a result the Commission required the following changes in the tariff:

g. The private line tariff proposed by the company shall be adopted with the following exceptions:

(1) The charge for a local channel between the serving office and the customer facility shall not be flat-rated as proposed in the tariff but instead shall be distance-sensitive. The rate shall be applied in quarter mile increments and the specific charge per increment should be determined by SWB with the approval of the Commission. These rates should generate an amount of revenue equal to that generated by the flat rates proposed by the company.

(2) SWB shall not be allowed to consider fractional miles as full miles in determining the distance between any two serving offices. The company shall revise the proposed tariff to allow for the rounding of mileage calculations to the next highest quarter mile.

(3) It is in the public interest that prior to realigning the boundaries of serving offices, SWB shall notify the Commission at least sixty (60) days in advance

of such realignment. The Commission staff shall have the option of requesting a public hearing on such realignments, at which the Commission may approve or disapprove such. If no objection is indicated by the staff within twenty (20) days after the proposed realignment is reported, no hearing or Commission order shall be deemed necessary.

(4) The company's proposed tariff states that Type 102 service "may be implemented by either metallic channels or by other means at the telephone company's option." While realizing the economic necessity for SWB to add or convert to carrier facilities, the Commission also recognizes the customers' need for an adequate planning horizon. SWB shall make available, at the Commission, information concerning the availability of facilities and shall notify customers for such services at least one year in advance of those facilities not being available.

Public utility regulation is a legislative function. *Railroad Comm'n v. Houston Natural Gas Corp.*, 155 Tex. 502, 289 S.W.2d 559 (1956). In 1975, the Texas Legislature passed the Public Utility Regulatory Act.[3] That Act created the Public Utility Commission and authorized the Commission to "fix and regulate rates of public utilities, including rules and regulations for determining the classification of customers and services and for determining the applicability of rates." PURA § 37.

The Attorney General argues that rate making is a legislative function and the Legislature has delegated that function to the Public Utility Commission. It is contended that the Commission has wide discretion when setting rates and is not required to accept a particular method of rate design. And, finally, the Attorney General argues that the rate structure in this case is supported by cost studies, by the universal

---

**3.** Tex.Rev.Civ.Stat.Ann. art. 1446c (herein referred to as PURA). Unless otherwise noted, citations to sections are to PURA sections.

service concept and by the value of service principle.

Bell also argues that the Commission has discretion in setting rates and contends that because pricing involves many subjective factors and requires a judgmental decision, the Commission is given broad discretion that allows it to consider universal service objectives, value of service concepts, and residual rate making practices. In addition to those concepts, Bell emphasizes that the Commission's increase in private line rates is justified by cost studies that show that private line service is unprofitable.

The universal service objective, value of service principle, and residual pricing method advocated by the Attorney General and Bell are historic concepts that the Commission recognized as support for its conclusions. The universal service objective originated in the Communications Act of 1934. 47 U.S.C. § 151 et seq.[4] Related to this objective is the residual pricing policy and the value of service principle. Basically, the universal service objective is founded on the concept that all subscribers to a telephone company's basic service network benefit when another person joins that network. Therefore, the entire network is more valuable because of the addition of the new subscriber. This universal service objective is achieved by residual pricing. Once an overall revenue increase is approved for the telephone utility, the revenue requirement will be distributed among the various services in a rate structure. Each service will absorb a part of the revenue increase; however, to insure that many persons will use the basic service, the rates for basic service are kept lower. This is accomplished by distributing as much of the revenue increase as possible to non-basic services before increasing the rates for basic service. Therefore, the basic rates are increased only by the residual amount. The value of service principle is related to the universal service objective because that

principle determines where a majority of a revenue increase is distributed in the rate structure. Those services that have the most inelastic demand (least sensitive to price changes) will absorb most of the revenue increase. Therefore, the consumers who place a higher value on telephone service will absorb more of the increase. Because these inelastic demand services absorb most of the revenue increase, the basic services can remain at a lower price thus furthering the universal service objective. The economic theory behind these concepts are explained by Professor John T. Wenders who testified in the Public Utility Commission's hearings below.

Finally, prices should depart from marginal cost for those services that confer benefits which do not pass via an exchange process. The nature of these so-called external benefits can be seen in the following way. Suppose someone is trying to decide whether or not he should become a subscriber to the telephone network. Presumably he will make his decision by weighing the costs and benefits *to him* of having a telephone. However, one important element in this decision will be missing in his decision process, since not all the benefits of his having a telephone will accrue to him. Specifically, the whole telephone network will become more valuable to any subscriber the *more* subscribers there are on that network. When a subscriber comes on the network, he makes the whole network somewhat more valuable to all others on the network—they benefit from the presence of an additional subscriber. Thus, not all of the social benefits of being on the telephone network will be weighed by the individual subscriber in deciding whether or not to join the network, and some may decide not to join because the costs exceed the benefits *to them*, when in fact the total benefits, including the benefits that flow to others, may exceed

---

**4.** 47 U.S.C. § 151 states in part,

"For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a

rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, . . ."

the costs. The way to correct for this possible distortion is to lower (or subsidize) the access price below marginal cost to account for the external benefit of having a new subscriber on the telephone network. This is the economic reason for the universal service objectives which most telephone companies achieve by residual pricing.

Against this, TASA argues that all rates must be just, reasonable, and not unreasonably discriminatory, and that the Commission is required by statute to ascertain the cost of each service and the adjusted value of invested capital used in providing each service. Accordingly, TASA argues that rate structures are governed by PURA § 40(a) which states:

> The regulatory authority shall not prescribe any rate which will yield more than a fair return upon the adjusted value of the invested capital used and useful in rendering service to the public.

PURA § 40(a). TASA contends that the Commission must determine the return on adjusted value of invested capital used in rendering each service for which a rate is charged. TASA's argument would thus require Bell and the Commission to compute the adjusted value of invested capital used in each particular service.[5] We disagree.[6]

This Court has previously rejected a similar argument in *Railroad Commission v. Weld & Neville*, 96 Tex. 394, 73 S.W. 529 (1903). In *Weld & Neville*, the plaintiffs alleged that railroad freight rates were discriminatory. The plaintiffs baled cotton using the "Lowry" system which compressed cotton more densely than other methods of baling. The plaintiffs argued that due to the Lowry system, a railroad could ship more Lowry bales per car than other bales; therefore, the railroads derived greater profits by shipping Lowry bales and thus discriminated against users of the Lowry system. This Court rejected that argument and said,

> In truth, if such a rule was adopted as that proposed by the plaintiffs in this case, the commission's work could not possibly be sustained in any court, for it might, by comparison between rates on different articles, and by showing a difference in profits derived from the transportation of one over the other, destroy any schedule of rates that could be prepared.

73 S.W. at 534. *See also, Caldwell v. City of Abilene*, 260 S.W.2d 712 (Tex.Civ.App. 1953, writ ref'd), where the court held that

---

5. Section 40(a) refers to the adjusted value of invested capital. Section 41 defines adjusted value of invested capital as follows:

   (a) Adjusted Value of Invested Capital. Utility rates shall be based upon the adjusted value of property used by and useful to the public utility in providing service including where necessary to the financial integrity of the utility construction work in progress at cost as recorded on the books of the utility. The adjusted value of such property shall be a reasonable balance between original cost less depreciation and current cost less an adjustment for both present age and condition. The regulatory authority shall have the discretion to determine a reasonable balance that reflects not less than 60% nor more than 75% original cost, that is, the actual money cost, or the actual money value of any consideration paid other than money, of the property at the time it shall have been dedicated to public use, whether by the utility which is the present owner or by a predecessor, less depreciation, and not less than 25% nor more than 40% current cost less an adjustment for both present age and condition. The regulatory authority may consider infla-

tion, deflation, quality of service being provided, the growth rate of the service area, and the need for the public utility to attract new capital in determining a reasonable balance.

6. Although § 40 states that "[t]he regulatory authority shall not prescribe *any* rate . . . ." (emphasis added), § 40 refers to the overall rate and not to rate structures. The language in § 40 was once in article 1119. 1931 Tex.Gen. Laws, ch. 226, at 380. Article 1119 stated in part, "[t]he governing body shall not prescribe *any* rate or compensation which will yield more than a fair return upon the fair value of the property used and useful in rendering its service . . . ." (Emphasis added.) (Article 1119 was repealed by PURA.) Article 1119 authorized General Law Cities to regulate utilities within their borders; however, it did not prohibit the cities from classifying customers and charging different rates to each class, nor did it require that rate schedules be based on profit. See *City of Wink v. Wink Gas Co.*, 115 S.W.2d 973 (Tex.Civ.App.1938, writ ref'd).

rates were not required to be based on costs.

■ TASA, like *Weld & Neville*, would require a comparison of profits and rates of return between services. This would deprive the Commission of much needed discretion. To determine the rate of return for each service, Bell would need to determine the expenses of each service and determine the adjusted value of property used in each service. Such a proposal assumes the existence of a structured world with only black and white and no gray. TASA's proposal assumes that an invariable, inflexible system of accounting exists and that the adjusted value of property could be allocated in an unquestionably uniform manner. However, in reality TASA's system would require arbitrary allocations based on a multitude of assumptions. Such assumptions would be subjective and not universally accepted. The proposal would yield no more accurate results than other less costly means.[7]

■ In designing a rate structure, the relevant section of PURA is § 38 which states in part:

> It shall be the duty of the regulatory authority to insure that every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable. Rates shall not be unreasonably preferential, prejudicial, or discriminatory, but shall be sufficient, equitable, and consistent in application to each class of consumers.

PURA § 38. In general, § 38 requires rate structures to be just, reasonable, and not unreasonably discriminatory. This broad standard allows the Public Utility Commission discretion to determine the method of rate design. It also gives the Commission the discretion to consider factors other than cost and adjusted values of property. Rate design is a complex problem that involves many factors. In *Caldwell v. City of Abilene, supra*, the court rejected the argument that discrimination in rates must be based on cost. The court recognized that rate classifications could be based on factors as "the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use or any other matter which presents a substantial difference as a ground of distinction." *Id.* at 714. In *Ford v. Rio Grande Valley Gas Co.*, 141 Tex. 525, 174 S.W.2d 479 (1943), the Court recognized quantity used, time of use, manner of service, and cost as factors. In *Texas Power and Light v. Doering Hotel Co.*, 147 S.W.2d 897 (Tex.Civ.App.1941) aff'd 139 Tex. 351, 162 S.W.2d 938 (1942), the Court cited other factors such as "similarity, from the standpoint of the utility, of the service rendered, such, for example, as the volume of the current required, the cost to the company furnishing it, when the peak of the load occurs, the constancy and regularity of the use made by the consumer, and other similar circumstances." *Id.* at 902.[8] Each of these factors, including value of service[9] are proper for Commission consideration.

---

7. The accounting procedures required by TASA would also cost more and such costs would be passed to consumers. This is a factor that the Commission should consider. *See General Telephone Co. of S. W. v. City of Garland*, 509 S.W.2d 927, 931 (Tex.Civ.App.1974, writ ref'd n. r. e.). *See generally*, Bonbright, Principles of Public Utility Rates at 296 301 (1961).

8. Because each utility industry may have a unique characteristic that requires other factors to be given more weight, these factors may vary from one utility industry to another. In *Ford*, a gas utility was involved and cost was cited as a principle factor. The telephone industry is different because of the universal service objective, therefore, cost may not be the

overriding factor in that industry. These various considerations illustrate the need for Commission discretion.

9. The Wisconsin Public Service Commission recognized the value of service principle as long ago as 1937. In *Re: Wisconsin Telephone Co.*, 22 PUR 220 (Wis.Pub.Serv. Comm'n, 1937), value of service justified a decrease in rural telephone rates and the Commission stated, "[t]he value of service must be considered as well as the cost of service. Under some circumstances, indeed, and perhaps especially in rural telephone service, the value of the service may be entitled to more weight than an estimate of the cost of service which necessari-

■ Although we hold that the Commission has discretion to determine the factors relevant to rate design, including the three historic concepts discussed above, there are two overriding considerations. The first consideration is consistency. Bell continually comes before the Commission for rate increases. There are many factors to consider and different factors can yield different results. Therefore, the Commission should take caution not to allow a utility to arbitrarily alter factors considered relevant. Utilities are to be consistent in their applications and may not, without supporting evidence, vary their mathematical formulas or relevant factors so as to fit their alleged needs.[10] The second overriding consideration is the burden of proof which is placed on the the utility by § 40(b). We have previously recognized Bell's size and how it creates an "aura of self-evaluation" in Commission proceedings. *State v. Southwestern Bell Telephone Co.*, 526 S.W.2d 526, 532 (Tex.1975). We also recognize that Bell has the data and expertise required to design rate structures. Therefore, to justify their rate structure, Bell must present its data and produce additional information that is reasonably requested by the Commission or intervenors. In summary, the Commission has discretion to determine relevant factors in a rate design problem; those factors must address whether the resulting rate structure is just, reasonable, and not unreasonably discriminatory; the utility must be consistent in proceedings; and the burden of proof of the utility includes the obligation to produce relevant information.

The judgment of the District Court is affirmed.

GARWOOD, J., not sitting.

ly involves many allocations on a more or less arbitrary basis. This has consistently been recognized by both utility managements and by Commissions as applying notably to differentials in rates for various classes of telephone service. It must be remembered that telephone service involves communication between two persons and if the opportunities for talking with the desired persons are limited, the service becomes less valuable." *Id.* at 221.

10. We note that the Commission ordered Bell to "track" the rates which are based on long range incremental analysis. Such an order will require consistency in Bell's mathematical formula and we approve this requirement. The suggestion that these rates be tracked was made by a witness for the Commission staff.