**PEDERNALES ELECTRIC COOPERATIVE, INC., Guadalupe Valley Electric Cooperative, Inc., New Braunfels Utilities, De Witt County Electric Cooperative, San Bernard Electric Cooperative, Inc., the City of San Marcos, and its Agent, Electric Utility Board, Appellants,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, Appellee.**

**No. 3–90–147–CV.**

Court of Appeals of Texas, Austin.

May 8, 1991.

David C. Duggins, Clark, Thomas, Winters & Newton, Austin, for Pedernales Electric Co-op., Inc.

Richard C. Balough, Austin, for Guadalupe Valley Elec. Co-op., Inc., New Braunfels Utilities, De Witt County Elec. Co-op., Inc., San Bernard Elec. Co-op., Inc.

Karl H. Moeller, Sawtelle, Goode, Davidson & Troilo, Austin, for the City of San Marcos and its agent, Elec. Utility Bd.

Earnest Casstevens, Austin, for Bluebonnet Elec., et al.

Don R. Butler, Butler & Casstevens, Austin, for Cities of Bastrop, Fredericksburg, and Georgetown.

Jim Mattox, Atty. Gen., Susan D. Bergen, Asst. Atty. Gen., Austin, for Public Utility Com'n of Texas.

Before POWERS, ABOUSSIE and KIDD, JJ.

ABOUSSIE, Justice.

Appellants[1] are wholesale customers of the Lower Colorado River Authority (LCRA) that challenge a rate design decision of the appellee Public Utility Commission (PUC or the Commission). In Docket No. 8400, the Commission refused to reinstate a voltage differential between 138 kilovolt ("kV") customers and 69 kV customers. The voltage differential had been collapsed as a result of the Commission's order in an earlier rate case. *Application of Lower Colorado River Authority for Authority to Change Rates*, Docket No. 8032, 14 P.U.C.Bull. 1566 (Sept. 22, 1988). Appellants sought judicial review of the Commission's decision in the district court of Travis County, which affirmed the Commission on all points. From that final judgment, appellants appeal to this Court.

Appellants complain that the district court erred in affirming the order of the Commission because by its decision the Commission treated two groups of customers alike, even though the evidence and Commission findings determined that they were two distinct classes; thus, the Commission violated the anti-discrimination provision of the Public Utility Regulatory Act ("PURA"), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 38 (Supp.1991). In addition, they argue that the PUC violated the Texas Administrative Procedure and Texas Register Act ("APTRA") either because its

findings of fact were not based on substantial evidence or because its decision was arbitrary and capricious. *See* Tex.Rev.Civ. Stat.Ann. art. 6252–13a, § 19(e)(5), (6) (Supp.1991). They also assert that the Commission violated APTRA by failing to include required underlying fact findings and by basing its decision on a vote trade between two Commissioners. *See* APTRA §§ 16(b); 19(e)(3) (Supp.1991). One appellant urges that the Commission erred in refusing to allow it to present rebuttal testimony. We will affirm the judgment of the trial court.

*The Controversy*

LCRA sells electricity at wholesale to forty-four customers of varying size. These customers take delivery at voltage levels of 138 kV, 69 kV, and 12.5 kV. The interests of 12.5 kV customers are not in issue. The controversy centers on whether the LCRA should be allowed to continue treating wholesale customers which receive electricity at 138 kV and 69 kV levels as members of one customer class.

Because it is easier and more economical to transport electricity at high voltage levels, the low voltage electricity generated by LCRA is transformed to higher voltage levels through a "step-up transformer." LCRA uses transmission and subtransmission levels of 345 kV, 138 kV, and 69 kV. Electricity that is transmitted on the 345 kV lines must be "stepped down" to the lower voltage lines at which its customers take delivery. All of LCRA's 345 kV lines are connected directly to 138 kV transformation facilities. Some LCRA customers take delivery at this level. The electricity delivered at the 69 kV level must go through additional LCRA-owned transformation facilities to step the electricity down to the level at which the customer can receive it.

In 1985, the Commission approved a rate design based on a voltage differential that established one charge for delivery at the 69 kV level and a lower charge for delivery at the 138 kV level. *Application of Lower*

---

1. Appellants are the Pedernales Electric Cooperative, Inc., Guadalupe Valley Electric Cooperative, Inc., New Braunfels Electric Cooperative, Inc., New Braunfels Utilities, De Witt County Electric Cooperative, Inc., San Bernard Electric Cooperative, Inc., and the City of San Marcos.

*Colorado River Authority for Authority to Change Rates*, Docket No. 6027, 11 P.U.C.Bull. 125 (June 10, 1985). In LCRA's next rate case, the parties entered into a stipulation that provided for the continuation of the voltage rate differential. *Application of Lower Colorado River Authority for a Rate Increase*, Docket No. 7512, 14 P.U.C.Bull. 156 (Oct. 22, 1987).

In a still later rate case, LCRA requested that the differential be continued unchanged. *Application of Lower Colorado River Authority to Change Rates*, Docket No. 8032, 14 P.U.C.Bull. 1566 (Sept. 22, 1988). An intervenor, Bluebonnet Electric Cooperative, Inc. ("Bluebonnet"), requested that the voltage differential between 138 kV and 69 kV be collapsed so there would be one delivery rate for both 138 kV customers and 69 kV customers. LCRA did not present testimony refuting Bluebonnet's position. The Commission ordered the voltage differential collapsed for rate design purposes.

Forty-two days after the Commission ordered the voltage differential collapsed in Docket No. 8032, LCRA filed Docket 8400, from which this appeal arises. *Application of Lower Colorado River Authority for Authority to Change Rates*, Docket No. 8400, 15 P.U.C.Bull. 969 (July 11, 1989). In Docket No. 8400, much of the evidence regarding rate design focused on the terms of a stipulation sponsored by the majority of the parties. The stipulation would have implemented a transmission-facilities credit in place of a voltage differential as a means of compensating the 138 kV customers on LCRA's system. The hearing examiner recommended rejection of the stipulation due to lack of time for its full evaluation. The Commission adopted that recommendation but rejected the hearing examiner's recommendation to reinstate the voltage differential. Instead, the Commission decided that LCRA should retain the voltage differential collapse ordered in Docket No. 8032 to maintain consistency in LCRA's rate design.

The Commission's order adopted the hearing examiner's report, with some modifications, and made the report part of its order. The controversy in the present cause centers around finding of fact no. 59, concerning the voltage differential. As recommended in the examiner's report, finding of fact no. 59 would have reinstated the voltage differential and would have substantiated the reasons for the reinstatement in considerable detail. Her report suggested the following:

59. The voltage level differential between 69 kV and 138 kV transmission lines should be reinstated, because as discussed in Section IV.C.3 of this Examiner's Report, the evidence establishes that:

a. The 138 kV and 69 kV lines do not carry out the same function;

b. Over 95 percent of the power generated by LCRA is fed into the transmission system at the 138 kV level or above;

c. 69 kV lines primarily serve the function of carrying from the high voltage lines to customers at the distribution level;

d. The 69 kV lines serve as a link to the end-use customers, a function that could be classified as subtransmission;

e. LCRA transmission system reliability is not dependent on the 69 kV lines;

f. Because the fixed costs associated with the construction and maintenance of the 69 kV subtransmission system are not costs necessarily incurred by LCRA's 138 kV customers, those costs should not be borne by 138 kV customers;

g. During normal operations, power generated at the 345 kV and 138 kV transmission levels flows through the high voltage transmission facilities to the 69 kV transmission facilities to supply power at the distribution level;

h. Even though the LCRA transmission system is an integrated network there is a limit as to how much the 69 kV system is actually integrated, primarily because the 69 kV system cannot even begin to serve the magnitude of loads the 138 kV system supports;

i. As demonstrated by a miles-of-use analysis, the use of the 69 kV system is significantly less than the 138 kV system; and

j. Load flow changes have only a very minor impact on the 69 kV system.

Instead, the Commission rejected the above recommendation and substituted the following in its final order:

J. The Commission amends Finding of Fact No. 59 to read as follows:

59. Even though the evidence supports the fact that it would be reasonable to reinstate the voltage level differential between the 69 kV and 138 kV transmission lines, the voltage level collapse ordered in Docket No. 8032 should be retained, in order to maintain consistency in LCRA's rate design.

Appellants focus their attack on the Commission's finding of fact no. 59 on three grounds. First, they argue that the first clause is an implied finding that the voltage differential should be reinstated and that, therefore, either the Commission's finding of fact no. 59 was not supported by substantial evidence or its decision was arbitrary and capricious. Second, they argue that finding of fact no. 59 was not accompanied by underlying findings of fact, and thus violated § 16 of APTRA. Finally, they argue that finding of fact no. 59 is but a post hoc rationalization for the real basis of the Commission's decision—a vote trade—and that the decision is thus void because it is arbitrary and capricious, or because it was reached by an illegal procedure.

*Finding of Fact 59 Does Not Constitute A Finding that 69 kV Customers and 138 kV Customers Are Different Classes of Customers.*

■ Finding of fact no. 59 begins, "[e]ven though the evidence supports the fact that it would be reasonable to reinstate the voltage level differential between the 69 kV and 138 kV transmission lines...." Appellants argue that this clause and parts of the hearing examiner's report as adopted into the Commission's order amount to an implied Commission finding that 69 kV and 138 kV users constitute different classes of customers. If the Commission so found, then appellants argue further that retention of the voltage collapse violates § 38 of PURA, which provides that "[r]ates shall not be unreasonably preferential, prejudicial, or discriminatory, but shall be sufficient, equitable, and consistent in application to each class of consumers." PURA § 38. If substantial differences exist, it is possible that an unreasonable application of the same rates may be discriminatory. *Amtel Communications v. P.U.C.*, 687 S.W.2d 95, 109 (Tex. App.1985, no writ).

The quoted clause from finding of fact no. 59 is not an implied finding that 69 kV consumers and 138 kV consumers are two distinct classes of consumers within the meaning of § 38. In the context of the final order, this clause represents no more than the Commission's failure to find that the differential should be reinstated.

In its final order adopting the hearing examiner's report, the Commission specifically rejected the portion of section IV.C.3 that covers the voltage differential issue to the extent that it is inconsistent with the modification of finding of fact no. 59. Appellants' contention that, by adopting parts of Section IV.C.3 the Commission also adopted the sections supporting the differential, is unpersuasive. Had the Commission meant to adopt evidence and findings supporting the differential, it need not have specified which parts of Section IV.C.3 it was adopting; it could have adopted it in its entirety.

In addition, conclusion of law no. 10, by finding that the order is consistent with § 38, contradicts the argument that, by implication, the Commission found that two separate classes existed. Conclusion of law no. 10 tracks the language of § 38:

The rates which result from the Commission's Order are just and reasonable; are not unreasonably preferential, prejudicial, or discriminatory; and are sufficient and equitable if consistently applied within each class of consumers as required by Section 38 of PURA.

By adopting both finding of fact no. 59 and conclusion of law no. 10, the Commission reiterated its judgment that 69 kV customers and 138 kV customers are not different classes within the meaning of PURA § 38.[2]

*Finding of Fact No. 59 Was Supported by Evidence; The Commission's Decision Was Not Arbitrary or Capricious.*

■ Findings of fact are similar to answers of a trial judge or a jury to controlling fact issues in a case. *Railroad Comm'n v. Palmer*, 586 S.W.2d 934, 937 (Tex.Civ.App.1979, no writ); *Imperial Am. Resources Fund, Inc. v. R.R. Comm'n*, 557 S.W.2d 280, 286 (Tex.1977).

The disputed clause here in question is similar to a jury's failure to find a particular fact, and has the same consequence. Appellant had the burden to convince the Commission that the status quo—the differential collapse—was discriminatory under § 38. Finding of fact no. 59 indicates that the Commission refused to find from the evidence that 69 kV and 138 kV customers constitute two different classes; it means that the appellants failed to carry their burden of proof on this issue. *See C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966).

■ Because it represents the Commission's failure to find, the first clause of finding of fact no. 59 is superfluous: AP-TRA § 16(b) requires the Commission only to state those findings that support its ultimate findings; it is not required to state facts that it rejected and upon which it did not rely in reaching its conclusions. *State Banking Bd. v. Valley Nat'l Bank*, 604 S.W.2d 415, 419 (Tex.Civ.App.1980, writ ref'd n.r.e.). Nevertheless, we will address appellants' contentions that finding of fact no. 59 is either not reasonably supported by substantial evidence as required by APTRA § 19(e)(5) or is arbitrary and capricious as proscribed in APTRA § 19(e)(6).

Appellant San Marcos, in its second point of error, argues that there was "no evidence" to support finding of fact no. 59. "No evidence" generally refers to the rules of review that bind an appellate court when it considers certain legal sufficiency points in civil and criminal cases. *See* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361 (1960). For most agency decisions in contested cases, however, the scope of review is specified in APTRA § 19(e).

We interpret the contention of San Marcos to be a complaint that finding of fact no. 59 is not reasonably supported by substantial evidence as required by APTRA § 19(e)(5). To determine whether an agency's finding is supported by substantial evidence we must determine whether, in considering the record upon which the decision is based, the evidence as a whole is such that reasonable minds could have reached that finding. *Texas State Bd. of Dental Examiners v. Sizemore*, 759 S.W.2d 114, 116 (Tex.1988), cert. denied, 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 662 (1989); *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.* 665 S.W.2d 446, 453 (Tex.1984).

The examiner's report, adopted as part of the agency's order, describes the issue as hotly contested: "[t]he record is replete with arguments for and against continuing the collapse." Finding of fact no. 59 acknowledges that it would be reasonable to treat the 69 kV and 138 kV customers differently; the record also reveals that the commission had a reasonable basis for refusing to change its policy of treating the 69 kV and 138 kV customers as one class of customers for rate design purposes. LCRA, the General Counsel of the PUC, and Bluebonnet all introduced evidence in support of retaining the collapse.

According to the testimony in the record, LCRA delivers power through interconnected facilities which are necessary to transfer energy from the point of generation to the customers' distribution load centers. LCRA engineer Brad Belk testified that delivery of its power at different voltage levels does not warrant different rate treatment:

---

**2.** Appellants do not challenge conclusion of law no. 10.

Power flows from generators to loads over any and all electrical paths available to it. Power can and does move back and forth between the different voltage levels. The 69 kV portion of LCRA's transmission system is operated in exactly the same way as the 138 kV and 345 kV portions of the system and is electrically parallel ... All LCRA customers make some use of the transmission lines at all three voltage levels regardless of the voltage level at which they take delivery.

The Commission's General Counsel agreed that the voltage differential, as historically designed and applied in LCRA's rates, was not the appropriate mechanism for compensating customers who own transmission facilities.

Bluebonnet's witness argued that the 138 kV and 69 kV transmission lines form a transmission network and that the 69 kV network operates with and supports the 138 kV network. He also stated that the 69 kV and 138 kV systems serve the same function: "[F]or a change external to LCRA's transmission system, as well as for a change internal to LCRA's transmission system, all of LCRA's transmission system is impacted ... therefore, the 69 kV and 138 kV systems are functionally the same." Because the 138 kV lines and 69 kV lines perform the same function of transmitting bulk power from LCRA's generators to its load centers, and because the 138 kV and 69 kV lines are all tied into the same transmission system, all LCRA customers should bear the costs associated with operating the 138 kV lines and 69 kV lines equally according to this witness.

■ Appellants also attack the Commission's decision as arbitrary and capricious. *See* Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(e)(6). They argue that, by establishing a new class for the University of Texas Balcones Research Center (Balcones), based on "reasonable load characteristic and cost of service reasons," the Commission was also obliged to create different classes for 69 kV and 138 kV customers based on cost of service.

Review under the "arbitrary and capricious" standard is limited and deferential. Examples of conduct that have been found to be arbitrary and capricious include: basing a decision on legally irrelevant factors or failing to consider statutorily-mandated relevant factors in making an agency's decision, *Consumers Water v. Public Util. Comm'n of Texas*, 774 S.W.2d 719, 721 (Tex.App.1989, no writ); granting a certificate of service to a public utility for a reason other than the statutorily defined reasons, *Public Util. Comm'n of Texas v. South Plains Elec. Coop.*, 635 S.W.2d 954, 957 (Tex.App.1982, writ ref'd n.r.e.); in denying a permit, relying on additional requirements neither expected by applicant nor proposed by staff, *Starr Co. v. Starr Indus. Serv. Inc.*, 584 S.W.2d 352, 355 (Tex.App.1979, writ ref'd n.r.e.).

■ In this case, the Commission did not act arbitrarily or capriciously. PURA grants the Commission considerable discretion in deciding rate design issues. *Texas Alarm & Signal Ass'n v. Public Util. Comm'n*, 603 S.W.2d 766, 772 (Tex.1980). So long as the Commission addresses the rate considerations set by PURA, the particular factors and the weight to be given those factors are within the Commission's discretion. *Public Util. Comm'n v. AT & T Communications*, 777 S.W.2d 363, 366 (Tex.1989); *Texas Alarm & Signal*, 603 S.W.2d at 772–73.

■ Under PURA § 38, the Commission may establish classes of customers and set differing rates for such classes so long as the rates are not *unreasonably discriminatory* as to a particular class of customers. *Texas Alarm & Signal*, 603 S.W.2d at 770 (emphasis added). Further, the Commission may consider a variety of factors in making rate design decisions. *See Texas Alarm & Signal*, 603 S.W.2d at 772. Appellants focus on cost differences, arguing that if cost justified the creation of Balcones as a separate class, then cost also should have justified treating 69 kV and 138 kV-users as different classes. However, the Commission also cited Balcones's load factor as a reason for treating it as a separate class. The Commission's decision

to create a separate class for Balcones at the same time that it retained the voltage collapse was not arbitrary or capricious.

*The Commission's Finding Was Not Statutorily Required.*

■ Appellants also complain that the trial court erred in failing to find that the PUC acted arbitrarily and capriciously by failing to include underlying facts supporting finding of fact no. 59. Essentially, they argue that the fact findings are inadequate under APTRA § 16(b), which provides in relevant part that "[f]indings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." Appellants complain that finding of fact no. 59 was not accompanied by a statement of its underlying facts and failed to meet the requirement that findings of fact be non-conclusory and specific. *See Charter Medical,* 665 S.W.2d at 451.

It is important to distinguish between ultimate findings of fact and the basic facts underlying the ultimate findings:

> An ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact. It is to be distinguished from the findings of primary, evidentiary, or circumstantial facts, which constitute the "basic" facts. Facts of a basic or underlying nature are reached from a consideration of the evidence in the record. From these basic facts the ultimate facts, usually in the language of the statute, are to be inferred.

Shannon and Ewbank, *The Texas Administrative Procedure and Texas Register Act Since 1976—Selected Problems,* 33 Baylor L.Rev. 393, 409 (1981) (footnotes omitted). *See also* Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases,* 16 Tex.Tech L.Rev. 475 (1985).

Although labelled "finding of fact," amended finding of fact no. 59 is more accurately described as an ultimate finding or a conclusion of law because it clearly implies the Commission's exercise of "dis-

cretion or judgment ... based on a multitude of factors." *See Lewis v. Gonzales County Sav. and Loan Ass'n,* 474 S.W.2d 453, 457 (Tex.1971).

We will reject appellants' contentions because underlying fact-findings are not required in the present cause. *Charter Medical* and the cases following are unequivocal: § 16(b) mandates underlying fact-findings *only* for statutorily required findings: "we hold that section 16(b) of the APTRA requires an accompanying statement of underlying facts only when the ultimate fact finding embodies a mandatory fact finding set forth in the relevant enabling act." *Charter Medical,* 665 S.W.2d at 451. Thus, when an agency makes ultimate findings that are not statutorily required, no underlying findings are necessary. *Id.; see also Imperial Am.,* 557 S.W.2d at 286; *Galveston County v. Texas Dept. of Health,* 724 S.W.2d 115, 125 (Tex.App.1987, writ ref'd n.r.e.) (because the relevant enabling act does not require the Department to make any particular findings of ultimate fact before issuing a permit, the Department was not obliged to make any findings of basic fact at all by reason of § 16(b) under the holding of *Charter Medical*); *Public Util. Comm'n v. Texland Elec. Co.,* 701 S.W.2d 261, 269 (Tex.App.1985, writ ref'd n.r.e.).

A "finding of fact set forth in statutory language," is either a mandatory finding set forth in the relevant enabling act, or a finding that represents a criterion the legislature has directed the agency to consider in performing its function. *Charter Medical,* 665 S.W.2d at 451; *Consumers Water,* 774 S.W.2d at 722.

"Consistency" as used in finding of fact no. 59 does not represent a mandatory finding set forth in the enabling act or a criterion that the legislature has directed the agency to consider. PURA contains only one reference to "consistency"—the provision of § 38 discussed above. We conclude that the "consistency" referred to in finding of fact no. 59 is consistency in rate design between dockets, rather than that in § 38 regarding consistency of rates as applied to classes of customers. By explicitly

referring to Docket 8032, the Commission made clear that the "consistency in LCRA's rate design" is consistency in maintaining the voltage level collapse ordered in Docket Number 8032, only forty-two days before LCRA filed the docket at issue in the present case.

In addition, conclusion of law no. 10 in the final order explicitly refers to § 38 and is drafted to embody the fact finding required by that section. *See Charter Medical*, 665 S.W.2d at 451. If fact finding no. 59 also referred to the consistency standard of § 38, it would repeat conclusion of law no. 10. It is a basic rule of statutory construction that each sentence, clause, and word of a statute is to be given effect if reasonably possible. *Perkins v. State*, 367 S.W.2d 140, 146 (Tex.1963). Similarly, we presume that the Commission did not intend to make redundant ultimate findings or conclusions of law, and that, therefore, the "consistency" referred to in fact finding no. 59 is not the same "consistency" referred to in conclusion of law no. 10.

■ Because "consistency" as used in fact finding no. 59 is not a factor that PURA expressly requires the Commission to consider in the rate-making process, AP-TRA § 16(b) does not require findings of basic or underlying fact. *See Texland*, 701 S.W.2d at 269. Judicial review of findings not required by statute is limited to whether the basic findings fairly and reasonably supported the ultimate findings. *Galveston County*, 724 S.W.2d at 126; *Texland*, 701 S.W.2d at 273. "The reviewing court, in determining whether the administrative agency has adequately articulated its findings of fact and conclusions of law, is to give appropriate consideration to such statements in the reports that were

adopted by the Commission in its final order." *AT & T*, 777 S.W.2d at 366. *See also Goeke v. Houston Lighting & Power Co.*, 797 S.W.2d 12, 15 (Tex.1990).

The examiner's report, as adopted by the Commission, shows why the Commission found that keeping the voltage collapse would be "consistent." [3] The report summarizes prior Commission orders in LCRA rate cases in 1985 and 1987, and in the 1988 order in which the Commission ordered the voltage differential collapse. *Application of Lower Colorado River Authority for Authority to Change Rates*, Docket No. 8032, 14 P.U.C. Bull. 1487 (Sept. 22, 1988). In Docket No. 8032, "[t]he Commission found the voltage differential between 138 kV and 69 kV systems to be technically not supportable and further found that the differential should be collapsed for rate purposes."

The examiner's report also recognizes that Docket No. 8400 is one in a series of rate filings. LCRA filed this application for an increase in rates as part of a plan for phasing the third unit of the Fayette Power Plant into the rate base. The biggest concern about bringing that unit into the rate base was "rate shock." LCRA devised a three-step approach for phasing in the debt service and for easing its impact on rates. Docket No. 7512 in 1987 was step one. Docket No. 8032 was step two. This docket filing represents step three. LCRA projected that at least one more rate increase would be necessary to address remaining debt costs, but no additional rate increases were projected until the late 1990s. The examiner's report, as adopted in the Commission's final order, reveals why the Commission based its decision in

---

**3.** In its brief, appellant Pedernales argues that if in finding of fact no. 59 the Commission was using "consistency" as meaning historical practice, then the Commission was creating a new standard not included in the enabling legislation. When an agency bases its decision on a factor not included in the enabling legislation, that decision is arbitrary and capricious under *South Plains*, 635 S.W.2d at 957 and *Starr County*, 584 S.W.2d at 355–56. None of the appellants, however, made this argument in their motions for rehearing before the Commission.

Accordingly, they have waived their right to complain on appeal. *Sears v. State Bd. of Dental Examiners*, 759 S.W.2d 748, 750 (Tex.App. 1988, no writ). Indeed, in its motion for rehearing before the Commission, appellant Pedernales conceded that the Commission may base its decision on "consistency" as that term is used in finding of fact no. 59: "consistency in rate design is a factor to be considered but the Commission must still base its decision on the evidence before it."

finding of fact no. 59 on maintaining consistency in LCRA's overall rate design.

*The Commission's Order Was Not Based on a Vote Trade*

■ Appellants argue that the trial court erred in failing to find that the PUC acted arbitrarily, capriciously, and upon unlawful procedure, in rejecting the voltage differential. The core of their contention is that the decision was reached by means of an illegal vote trade, and that finding of fact no. 59 is merely an attempt to justify the Commission's arbitrary decision.

Appellants quote two separate interchanges, seven pages apart in the transcript, in support of their contention:

Commissioner Campbell: "Commissioner Cassin, I guess it's you and I are going to have to compromise somewhere down the road to get two votes on something out here if Chairman Greytok isn't going to deviate from her stand whatsoever."
Chairman Greytok: "It's unusual that I don't, but I feel firmly about it."
Commissioner Cassin: "If she's not going to change her mind, then you and I are going to have to work out a compromise."
Commissioner Campbell: "That's what it sounds like. Where are we—we differ on the voltage collapse and the seasonal rates."

. . . .

Commissioner Campbell; "Well, Commissioner Cassin, I'll go with you on seasonal rates if you will leave the voltage differential the way it is now."
Commissioner Cassin: "All right."

Appellants argue that these discussions reveal that the Commission's decision was made arbitrarily, in violation of APTRA § 19(e)(6). They argue that the colloquy shows that either the agency improperly based its decision on nonstatutory criteria, *South Plains*, 635 S.W.2d at 957, or the agency abused its discretion by basing its decision on legally irrelevant factors or by failing to consider legally relevant factors. *Consumers Water*, 774 S.W.2d at 721; *Starr County*, 584 S.W.2d at 355–56. Appellants argue, in the alternative, that the colloquy reveals that the decision was made upon unlawful procedure, as prohibited by APTRA § 19(e)(3).

We reject appellants' argument for several reasons. Final orders of an agency are presumed to be valid. *Imperial Am.*, 557 S.W.2d at 284. We must judge the agency order on the basis upon which it purports to rest. *Professional Mobile Home Transport v. Texas R.R. Comm'n*, 733 S.W.2d 892, 904 (Tex.App.1987, writ ref'd n.r.e.). In the present cause, however, the appellants do not attack the basis upon which the Commission's decision purports to rest—"consistency" in rate design between dockets—as either a non-statutory criterion or a legally irrelevant factor. *See* note 3, *supra*. Accordingly, we express no opinion as to whether using "consistency" as the basis of the Commission's decision violates APTRA § 19(e)(6) under the holdings in *South Plains, Consumers Water,* or *Starr County*.

We also reject appellants' argument because the record, evaluated as a whole, reflects a process of discussion, careful consideration, and compromise, rather than a "vote trade." Appellants argue that a jury decision based on such a "vote trade" would constitute misconduct. Assuming the analogy applies, however, such negotiations by a jury are permissible if they entail allowable "compromise" rather than vote trading.

Texas courts have recognize that jury verdicts may be products of compromise:

It is contemplated that jurors will engage in discussion and argument; and that if unanimity in answering the questions is ever to be reached concessions must be made and initial opinions and conclusions must in some instances be modified or even abandoned in the light of convincing discussion and argument. Such concessions and modifications of opinions will not ordinarily constitute jury misconduct.

*Rogers v. Stimson Contracting Co.*, 373 S.W.2d 548, 551 (Tex.Civ.App.1963, no writ). *See Queen City Land Co. v. State*, 601 S.W.2d 527, 529 (Tex.App.1980, writ ref'd n.r.e.) ("proof that the verdict was obtained by compromise does not constitute

proof of misconduct."); *Texglass, Inc. v. Suhovy*, 380 S.W.2d 904, 905–6 (Tex.Civ. App.1964, writ ref'd n.r.e.) (taking a straw vote, in the absence of an agreement to be bound by its results did not constitute reversible error); *Dickey v. Travelers Ins. Co.*, 356 S.W.2d 156, 159 (Tex.Civ.App.1962, writ ref'd n.r.e.) (testimony that it was necessary for jurors to "trade out" issues in order to reach a verdict did not show misconduct). Texas courts have been reluctant to probe the mental processes of the jury: "In the absence of overt acts of misconduct, it is not permissible to probe the minds of the jurors or to supervise their process of reasoning." *Dickey*, 356 S.W.2d at 159. Furthermore, Tex.R.Civ.P.Ann. 327(b) (Supp.1991) bars most testimony concerning the jury's process for reaching its decision.

■ Courts have been similarly reluctant to probe the mental processes of individual commissioners in administrative agencies. It is immaterial what a commissioner may have said or thought in the process of arriving at a decision. *City of Frisco v. Texas Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex.Civ.App.1979, writ ref'd n.r.e.); *see also United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (applying federal administrative law). "The thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained by appropriate findings and conclusions that have support in the evidence." *City of Frisco*, 579 S.W.2d at 72.

This is not to suggest that an examining court may never investigate a commissioner's thought processes. The Texas Supreme Court has held that an exception exists to the general rule that courts may not investigate the methods or motives behind an agency's action if there is "corruption in its inception." *Texas State Bd. of Examiners in Optometry v. Carp*, 388 S.W.2d 409, 414 (Tex.1965). The record here reveals no corruption in the inception.

On its face, the record in this cause shows three commissioners of divergent viewpoints struggling to promulgate a final order. In order to reach a decision, at least two of them must agree, a process that may require compromise. The conversations quoted as representing a "vote trade" reflect a small part of the 138 pages of transcript recording the Commission's deliberations in Docket No. 8400. The final order hearing started at 9:00 a.m. and, with breaks, continued until 4:30 p.m. The following summary of the commissioners' discussions puts the quoted passages into context.

During closing arguments, Campbell and Cassin questioned the purpose of the voltage differential and the wisdom of continuing the collapse ordered in Docket No. 8032. Following closing arguments, Greytok stated that she favored adopting the parties' stipulation. Campbell responded that she supported the examiner's report with some exceptions and expressed concern about doing "another flip-flop on the voltage collapse." Cassin did not embrace either position but suggested keeping a list of items upon which they disagreed.

Cassin then stated his position—he wanted to reestablish the voltage differential and to establish seasonal rates. Greytok pointed out that adopting the stipulation would achieve these ends, but Cassin refused to support the stipulation. He agreed with the examiner that the facilities-credit proposal in the stipulation had not been evaluated sufficiently.

Campbell suggested that she could compromise on seasonal rates, but that the voltage differential collapse should be continued. She then appeared to back away from her suggestion by stating that she agreed with the examiner on seasonal rates. Cassin repeated his preference for establishing seasonal rates and reestablishing the voltage differential. Cassin and Campbell discussed the differential, but reached no conclusion.

Cassin asked Greytok for her position on the differential and seasonal rates; she stated that she preferred the stipulation, but wanted to consider it further. After a break, Greytok reaffirmed her support for the stipulation; Cassin again rejected the

stipulation because of the facilities credit provision.

Campbell repeated that she would not approve the stipulation; her only objection to the examiner's recommendation was the "flip-flop" on the voltage differential. She argued that if the voltage differential were reinstated, some customers would suffer a big rate increase. Cassin inquired, "Are we going to vote 1–1–1?" Greytok re-urged adoption of the stipulation; again, Campbell rejected it.

At this point, the first exchange quoted above took place. Campbell stated that if at least two Commissioners could not agree on a final order, then LCRA's rate proposal, which none of the commissioners supported, would go into effect. She stated that if Greytok refused to change her position on the stipulation, then Campbell and Cassin would have to compromise. They then asked the examiner to summarize the issues that had not been decided. The examiner identified the outstanding issues as seasonal rates versus ratchet, the voltage differential, direct and allocated water, and retail sales proceeds.

Greytok asked Cassin to reconsider the stipulation because it contained his position on both seasonal rates and the voltage differential. Cassin declined. Campbell offered Cassin the resolution quoted by appellants in the second exchange above: retaining the collapse, but ordering seasonal rates, to which he agreed.

Out of context, the Commissioners' comments might arguably be viewed as a "vote trade." In the context of the whole transcript, however, these comments are part of the allowable and inevitable process of forging compromise out of divergent preferences, based upon the evidence produced.

■ Appellants also argue that the Commission's decision is based upon unlawful procedure in violation of APTRA § 19(e)(3). In the only reported case we have found touching upon an agency's unlawful procedure, *Texas State Board of Medical Examiners v. Nacol*, 696 S.W.2d 687 (Tex.App.1985, writ ref'd n.r.e.), the court of appeals affirmed the trial court's finding that the Board's decision had been based upon unlawful procedure. The opinion reflects the following:

A member of the board disqualified himself but attended the hearings and repeatedly conferred with its Chairman. The Board acted like prosecutors rather than fact finders and, in voting, used the word "guilty" to the allegations, rather than "true". Certain vials were considered by the Board, but were never introduced in evidence. Dr. Varon was to be a favorable witness, as well as other physicians, to Dr. Nacol but were "scared off" by an investigator of the Board. Dr. Varon did testify under a subpoena, after being assured of protection and immunity by a court. The testimony began in Wichita Falls, the hearing was then moved to Austin, then to Dallas. Board members conferred with witnesses in the halls outside the hearing room.

*Nacol,* 696 S.W.2d at 688.

The Commissioners' discussions in reaching their decision in Docket 8400 stand in stark contrast to the kind of behavior that constituted "illegal procedure" in the *Nacol* case. We reject appellants' contention that the Commissioners' compromise violated APTRA § 19(e)(3).

*The Commission Was Not Required to Accept Duplicative Rebuttal Testimony.*

■ Finally, one appellant, Guadalupe Valley Electric Cooperative, Inc. ("Guadalupe Valley"), alleges that the Commission erred in excluding from the record an exhibit that it presented as rebuttal testimony on the issue of the voltage level collapse. The point of error is overruled.

As the hearing examiner explained in her report, the Commission's usual practice is to allow only the company seeking the rate change to file any rebuttal testimony. In Docket No. 8400, however, a special procedure was granted whereby intervenors and staff would be allowed to file rebuttal testimony to issues intervenors raised if LCRA filed no response.

The special procedure was unnecessary because the differential collapse was contained in LCRA's original filing in the case;

**344**

it was not an issue raised by intervenors to which LCRA failed to respond. As required by PURA, when LCRA initiated Docket No. 8400, it also filed its evidence, including the prepared testimony of all witnesses and the exhibits in support of its petition to change rates. The scope of the prefiled case specified by PUC rules is such that the utility is required to go forward at the hearing on the data submitted with the filing: "the material submitted as the filing and supporting workpapers are required to be such composition, scope, and format so as to serve as the utility's complete case." 16 Tex.Admin.Code § 21.69(a) (1988). The Commission allows the applicant to file rebuttal testimony after intervenors and staff file their direct case, but intervenors are generally not entitled to present a rebuttal case. The party with the burden of proof is entitled to open and close. 16 Tex.Admin.Code § 21.103 (1988). This practice is consistent with the statutory requirement that the burden of proof to show that the proposed rate change is just and reasonable is on the public utility. *See* PURA § 40.

The examiner ruled to strike Guadalupe Valley's rebuttal testimony because:

1. the Examiner's orders had contemplated intervenor rebuttal only if LCRA did not respond to an issue raised by an intervenor and only if there was no adversarial testimony in the record;

2. a considerable amount of testimony was already in evidence; and

3. the additional evidence would be cumulative, would unduly delay the hearing, and would preclude opposing intervenors from replying to the rebuttal testimony.

In contested cases, irrelevant, immaterial, or unduly repetitious evidence shall be excluded. *See* APTRA § 14(a). Appellants submitted fifty-two exhibits that were admitted into evidence and presented a total of eleven witnesses. They were able to cross-examine all witnesses. The evidentiary hearing in this cause lasted twenty-four days and produced a 4,964 page transcript. The trial court did not err in refusing to find that the Commission acted arbitrarily or capriciously in affirming the striking of Guadalupe Valley's rebuttal testimony.

All of appellants' points of error are overruled, and the judgment of the trial court is affirmed.