# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00742-CV

**Nucor Steel, a division of Nucor Corporation, Appellant**

**v.**

**Public Utility Commission of Texas, TXU Electric Company, Texas Industrial Energy Consumers, Steering Committee of Cities Served by TXU Electric Company, and Office of Public Utility Counsel, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. GN104176, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

This is an appeal by Nucor Steel of a contested case proceeding, held before the Public Utility Commission, regarding the design of TXU Electric Delivery's[1] transmission and distribution rates. Nucor, an industrial TXU customer located in a non-municipal area, claims that the rate design ordered by the Commission unfairly imposes charges on non-municipal customers for costs incurred wholly within the municipality. Specifically, Nucor asserts that TXU should not be permitted to pass along its "franchise charges" as part of its base rates for non-municipal customers because those charges are calculated only on sales of electricity to municipal customers.

---

[1] The parties collectively use "TXU" to refer to TXU's transmission and distribution utility, which is currently named "TXU Electric Delivery," but was previously known by other names, including "Oncor Electric Delivery Company."

Appellees—the Commission, TXU, the Texas Industrial Energy Consumers, and the Steering Committee of Cities Served by TXU Electric Company—counter that it is reasonable to collect these charges from non-municipal customers because both municipal and non-municipal customers benefit from the purpose served by the franchise charge, which is TXU's ability to locate its electric lines on municipal streets, alleys, and public rights-of-way in order to provide electric service to all of its customers. Nucor also challenges the Commission's order on the grounds that it improperly allocates the franchise charges based on the volume of sales, as measured in kilowatt hours, rather than on the sales revenue, as was historically done. Appellees contend that it was reasonable to base the allocation on kWh because it tracks the 1999 amendments to the Public Utilities Regulation Act.[2]

Nucor urges this Court to reverse the Commission's determination that the franchise charges should be allocated based on kWh and collected from all customers (the "spread collection" method), on the grounds that the order was arbitrary and capricious, an abuse of discretion, and a violation of PURA. *See* Tex. Gov't Code Ann. § 2001.174(2) (West 2000) (standards for substantial evidence review of contested case); *see also* Tex. Util. Code Ann. §§ 33.008 (West Supp. 2004-05) (discussing franchise charges), 36.003 (West 1998) (primary section Nucor claims is violated, stating utility's rates must be "just and reasonable"). Appellees claim that the order should be affirmed because the Commission's decisions on rate design matters are entitled to deference and the order is supported by substantial evidence. We affirm the judgment of the district court upholding the Commission's order.

---

[2] PURA is codified in title 2 of the Texas Utilities Code. Tex. Util. Code Ann. §§ 11.001-63.063 (West 1998 & Supp. 2004-05).

## BACKGROUND

In 1999, the Texas Legislature passed Senate Bill 7 to deregulate aspects of the electric utilities industry, making several amendments to PURA. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543. The legislative intent was to increase competition by ending the monopoly historically enjoyed by a limited number of investor-owned utilities. Tex. Util. Code Ann. § 39.001 (West Supp. 2004-05). The utilities were "unbundled" into three entities: power generation companies, transmission and distribution utilities, and retail electric providers. *Id*. § 39.051(b) (West Supp. 2004-05). Only the transmission and distribution utilities remained subject to traditional, cost-based regulation after the start of competition in January 2002. *Id*. § 39.001.

Following the 1999 amendments, TXU applied to the Commission to establish cost-of-service rates for its newly unbundled transmission and distribution utility. *See id*. § 39.201 (West Supp. 2004-05) (requiring utilities to file proposed tariffs, including transmission and distribution utility charges). Nucor Steel and each of the appellees participated in the proceedings, which included a hearing at the State Office of Administrative Hearings, a motion for rehearing to the Commission, and an appeal to the district court.

At issue, here are the rates charged by TXU's transmission and distribution utility under the 1999 statutory provisions. Pursuant to PURA section 33.008, which was enacted that year, a municipality may impose a "franchise charge" on an electric utility[3] that provides distribution

---

[3] The statute expressly lists the following as the types of utilities upon which municipalities may impose a franchise charge: electric utilities, transmission and distribution utilities, municipally-owned utilities, and electric cooperatives. In discussing section 33.008, we will refer to these specified utilities generally as "electric utilities."

service within the municipality. *Id*. § 33.008. The term "distribution service" includes utilities that provide both transmission and distribution service, and "service within the municipality" includes utilities that serve customers both within and outside of the municipal borders, but excludes those that serve only non-municipal customers. *Id*. § 33.008(a)(1) (excluding non-municipal service from imposition of charges), (h) ("In this section, 'distribution service' means the delivery of electricity to all retail customers."). Because TXU is a transmission and distribution utility serving municipal and non-municipal customers, it is subject to the franchise charges set forth in section 33.008. *Id*.

The purpose of the charge is to reimburse the municipality for a utility's "use of a municipal street, alley, or public way to deliver electricity to a retail customer." *Id*. § 33.008(a). If an electric utility locates its facilities and lines on municipal property then, in exchange, it must pay the municipality a franchise charge. The statute defines the charge as a "reasonable and necessary operating expense of each electric utility" and mandates that it be included in the utility's "nonbypassable delivery charges" pursuant to section 39.107. *Id*. § 33.008(c); *see also id.* § 39.107(d) (West Supp. 2004-05) (electric utilities "shall bill a customer's retail electric provider for nonbypassable delivery charges").[4]

Section 33.008 specifies how the charge is to be calculated, but it is silent as to the methods by which utilities are to allocate and collect the charges. *Id*. § 33.008(b). The formula for calculating the franchise charge begins by dividing the "total franchise fee revenue collected by the

_____

[4] As a point of clarification, TXU's franchise charges are initially passed along to retail electric providers (REPs), who then shift the ultimate responsibility for payment to the customers. As one such customer, Nucor challenges the method in which TXU allocates and collects these charges.

4

municipality in 1998" by "the total kilowatt hours of electricity delivered by these utilities to municipal customers in 1998." *Id*. This yields the 1998 rate-of-revenue collected by a municipality from a utility, per kilowatt hour of electricity sold by that utility within the municipality. To determine the amount of the franchise charge, this 1998 rate is then multiplied by the total number of kilowatt hours of electricity sold by a utility to its municipal customers during a specified time period. *Id*. Therefore, while the rate of the franchise charge is derived from the amount of revenues historically collected, the ultimate charge is dependent on the volume of electricity sold within the municipality. As a result, the revenues collected by municipalities from franchise charges do not increase and decrease with the price of electricity; rather, they fluctuate based on the volume of sales, as measured in kWh. *See id*.

Historically, municipalities were entitled to collect "local gross receipts taxes" (LGRTs) from electric utilities for the same purpose as the franchise charge—the utility's use of municipal streets and rights-of-way to run its electric lines. *See* Tex. Tax Code Ann. § 182.025 (West 2002).[5] As implied by its name, the LGRT was historically based on the total amount of gross revenues earned by a utility for the sale of electricity within a municipality; the historical method of allocation was "direct" (allocated only on municipal sales) based on revenues, and the historical

---

[5] Section 182.025 was originally codified in 1981 as part of the tax code's "Subtitle G: Gross Receipts Taxes, Subchapter B: Utility Companies," stating that "[a]n incorporated city or town may make a reasonable lawful charge for the use of a city street, alley, or public way by a public utility in the course of its business." *See* Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1716. This section was amended in 1999 as part of Senate Bill 7 to bring it into conformance with the newly-enacted PURA section 33.008. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 56, 1999 Tex. Gen. Laws 2543, 2623.

method of collection was "spread," meaning that both municipal and non-municipal customers were responsible for paying their portion of the LGRT.

The legislature was concerned that deregulation would erode the amount of LGRTs collected by municipalities because, in the newly unbundled market, revenues would only accrue on the sale of transmission and distribution services and would no longer accrue on the sale of generation services. To prevent such revenue erosion, the legislature enacted section 33.008, which modified the revenue-based LGRT into a volume-based franchise charge, thereby providing a more stable source of compensation for the municipalities.[6]

In October 2000, an ALJ conducted a contested case hearing. *See generally* Tex. Gov't Code Ann. § 2001.051-.062 (West 2000) (rights and procedural rules regarding contested case hearings). One issue addressed during that proceeding was the method by which TXU should allocate and collect the franchise charges imposed on it by municipalities pursuant to section 33.008. *See* Tex. Util. Code Ann. § 33.008.

Regarding the method of allocation, TXU, TIEC, and the Commission staff recommended that the "direct" method be used, that is, that the charges be allocated only on municipal sales, and that the basis of the allocation be the volume of sales within the municipality, as measured in kWh. They urged that this plan would maintain the historical practice of direct allocation while updating the basis of the allocation—to be based on sales volume, in kWh, rather than on sales revenue—in order to parallel section 33.008's calculation of the franchise charge. *See*

---

[6] Nucor, TXU, TIEC, and the Commission agree on these historical facts and on the legislative intent behind section 33.008.

*id*. Although Nucor did not dispute that a direct allocation method should be maintained, Nucor did challenge TXU's proposed basis of the allocation, contending that the franchise charges should continue to be allocated based on sales revenue rather than on kWh. Nucor supported its recommendation by arguing that, because the calculation of franchise charges under section 33.008 is dependent in part on the 1998 revenue data, the historical practice of basing the allocation on revenues should not be altered.

Regarding the method of collection, TXU, TIEC, the Commission staff, and the Cities recommended that the franchise charges be collected from all customers, whether they be municipal or non-municipal residents; this is the "spread" collection method.[7] Nucor, as a non-municipal TXU customer, challenged this proposal and urged that a direct method of collection be used, meaning that only customers residing within the municipal boundaries would be responsible for paying the charge. The two proposals diverge on the issue of whether non-municipal customers benefit from the purpose for which the charge is imposed—TXU's ability to locate its electric facilities on municipal streets, alleys, and rights-of-way. *See id*. Arguing that all customers benefit from the integrated electric grid and that, historically, the LGRT was collected from all customers, TXU, TIEC, the Commission Staff, and the Cities supported the spread collection method. Countering that the franchise charge only benefits municipal customers and that it constitutes an improper tax by which non-municipal customers are forced to subsidize municipal projects, Nucor supported the direct collection method. Nucor further argued that the spread collection method violates PURA section

---

[7] TIEC supported spread collection in the alternative.

7

36.003, which requires that utility rates be "just and reasonable," because it unreasonably discriminates against non-municipal customers. *See id*. § 36.003.

In March 2001, the ALJ issued a proposal for decision concluding, among other things, that (1) the charges should be allocated using the "direct" method—based on sales within the municipality rather than systemwide sales; (2) given the enactment of section 33.008, the basis of the allocation should be the volume of sales, measured by kWh, rather than the historical method of basing the allocation on the gross sales revenues; and (3) the charges should be collected from all customers, both within and outside of the municipality—the "spread" collection method—because the franchise charge "continues to serve the entirety of the transmission and distribution system, benefits all customers in the system and, consequently, the costs should be shared among all customers through base rates." The ALJ determined that, pursuant to section 36.003, it is "reasonable, not unreasonably preferential, prejudicial, or discriminatory" for TXU to adopt a direct/spread plan based on an energy allocator. *See id*.

On October 3, 2001, the Commission issued a final order stating that its goal "is to institute, to the extent possible, a generic rate design that would honor the principles of cost causation, simplicity, and equity to customers." The Commission determined that the ALJ's conclusion satisfied this goal and thus adopted the PFD, finding that the franchise charges "should be allocated using a direct allocation and employing the energy allocator . . . [and] collected from all customers on TXU's system." The Commission agreed with the ALJ's conclusion that the direct allocation based on kWh and spread collection methods "honors the principles of equity" because the "franchise arrangement serves the entirety of the transmission and distribution system [and]

8

benefits all customers in the system." Further, the Commission concluded, as a matter of law, that the direct/spread methods comply with PURA sections 33.008 and 36.003. Nucor filed a motion for rehearing and then appealed the Commission's order to the district court. In October 2004, the district court affirmed the Commission's order.

## ANALYSIS

Nucor appeals to this Court, claiming in a single issue that the final order should be reversed because it was arbitrary and capricious, an abuse of discretion, and a violation of section 36.003 for the Commission to permit TXU to allocate its franchise charges using the direct method based on kWh sales and to collect these charges from municipal and non-municipal customers using the spread method. Because the final order was supported by substantial evidence, we affirm the judgment.

**Standard of Review**

We review commission proceedings under the substantial evidence rule. *Id*. § 15.001 (West 1998). That standard affords great deference to the Commission's decisions on topics that the legislature has determined are within the agency's discretion, such as rate design. Tex. Gov't Code Ann. § 2001.174. "PURA generally confers authority upon the PUC to regulate and supervise public utilities, to fix and regulate rates of public utilities, and to insure rates, operations, and services [] are just and reasonable to the consumers and to the utilities." *Public Util. Comm'n v. GTE-Southwest, Inc*., 901 S.W.2d 401, 407 (Tex. 1995).

9

Pursuant to the substantial evidence rule, we may not substitute our judgment for that of the Commission and we are to reverse or remand the case only if the Commission's decision (1) violates a constitutional or statutory provision, (2) exceeds the agency's authority, (3) was made through unlawful procedure, (4) is affected by another error of law, (5) is not reasonably supported by substantial evidence when considering the reliable and probative evidence in the record as a whole, or (6) is arbitrary or capricious or characterized by an abuse of discretion. Nucor challenges the Commission's decision on grounds (1), (5), and (6).

To prevail, Nucor bears the burden of overcoming a presumption that the Commission's findings are supported by substantial evidence. *Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 184 (Tex. App.—Austin 2004, no pet.). The evidence may actually preponderate against the Commission's finding and this Court must still uphold it if enough evidence suggests that the Commission's determination was within the bounds of reasonableness, that is, if substantial evidence supports its determination. *Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 215 (Tex. App.—Austin 1998, pet. denied). "The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994). Although the record may contain conflicting evidence, credibility is lent to the Commission's ultimate resolution of those conflicts when, as here, "the record, evaluated as a whole, reflects a process of discussion, careful consideration, and compromise." *Pedernales Elec. Coop. v. Public Util. Comm'n*, 809 S.W.2d 332, 341 (Tex. App.—Austin 1991, no writ).

10

**Rate Design**

PURA grants the Commission authority to "establish and regulate rates of an electric utility" and "to do anything . . . that is necessary and convenient to the exercise of [its regulatory] power." Tex. Util. Code Ann. §§ 14.001, 36.001 (West 1998). The Commission has "discretion to determine the method of rate design," which is "a complex problem that involves many factors." *Texas Alarm & Signal Ass'n v. Public Util. Comm'n*, 603 S.W.2d 766, 772 (Tex. 1980). The supreme court has rejected the notion that the Commission's rate design decisions must be based on a precise list of factors; while the Commission must address the rate considerations set forth in PURA, such as section 36.003's requirement that rates be "just and reasonable," it has discretion over the particular factors to consider and the weight to be given to those factors. *Cities of Abilene v. Public Util. Comm'n*, 854 S.W.2d 932, 949 (Tex. App.—Austin 1993), *partially rev'd on other grounds*, 909 S.W.2d 493 (1995); *see also* Tex. Util. Code Ann. § 36.003. Cost is not the only factor that is pertinent to the Commission's decision; the Commission may also consider the purpose for which the service is received, the quantity received, the time of use, and the consistency and regularity of use, among other factors. *Texas Alarm & Signal Ass'n*, 603 S.W.2d at 772; *see also Public Util. Comm'n v. AT&T Communications*, 777 S.W.2d 363, 366 (Tex. 1989).

Rate design is the "distribution of the revenue requirements among the various services" provided by the utility. *Texas Alarm & Signal Ass'n*, 603 S.W.2d at 768 n.2; *see also* Michael Little, *Rate Design*, 28 Baylor L. Rev. 1083 (1976) (discussing overall goals of rate design). The rate design process relies on the Commission's "informed judgment and expertise and utilizes projections and estimates in virtually all areas." *GTE-Southwest, Inc.*, 901 S.W.2d at 411; *see also*

11

*Southwestern Pub. Serv. Co.*, 962 S.W.2d at 214 (logical for Commission to have discretion over rate design based on complexity of issues and procedures). When PURA is silent as to an aspect of rate design, it demonstrates the legislature's intent to leave that decision within the Commission's discretion. *Reliant Energy, Inc.*, 153 S.W.3d at 189.

The questions at issue here, which regard the proper methods for TXU to allocate and collect its franchise charges as part of its customers' base rates, are rate design matters within the Commission's discretion. Rate design proceedings are frequently characterized by a utility's filing of a "statement of intent" to change its rates, which is then formally acted on by the Commission. *See Southwestern Pub. Serv. Co.*, 962 S.W.2d at 219; *see also* Tex. Util. Code Ann. §§ 33.024, 36.102 (West 1998). As part of deregulation, utilities were required to file "proposed tariff" documents with the Commission for the purpose of setting new rates. *Id*. § 39.201. Such filings are akin to statements of intent in that they characterize the proceedings as being for rate design purposes. Furthermore, PURA does not specify the methods by which TXU's franchise charges should be allocated and collected. *See id*. § 33.008 (specifying only the method of calculating the charges).[8] Because these issues are rate design matters upon which the statute is silent, the Commission's conclusions are entitled to great deference.

---

[8] Nucor acknowledges that the statute is silent on this matter. Nucor's expert, Dennis W. Goins, testified that "neither Senate Bill 7 nor PURA indicate whether or how LGRT should be allocated to rate classes in unbundled cost-of-service analyses. Moreover, they indicate only that the LGRT charge must be included in nonbypassable delivery charges without specifying the form that an LGRT charge should take—for example, a uniform charge applicable to all customers, [or] a charge applicable only to customers . . . within the boundaries of municipalities . . . ."

**Direct Allocation Based on kWh**

Nucor claims that the franchise charges are "driven by historical revenue sales" and, thus, it is inconsistent with the goal of cost-causation[9] to allocate them based on "present kWh sales." Instead, Nucor urges, TXU should continue to use "the historical method of allocating franchise charges on the basis of gross revenues derived by TXU." Appellees counter that the Commission's decision to allocate the franchise charges based on kWh is supported by substantial evidence.

At the SOAH hearing, TXU's expert, J. Michael Sherburne, testified that the benefits of basing the allocation on kWh include that "(1) it maintains the existing rate structure, (2) it is consistent with metering facilities available for this type of service, and (3) it eliminates cost shifting due to a change in rate design." Sherburne urged that the only basis for Nucor's proposal was that it "would virtually eliminate any allocation of [the charge] to [Nucor]." Sherburne also rebutted Nucor's proposal by stating that it is "contrary to TXU's past allocation method . . . and is contrary to the clear cost causative factor." Jeffry Pollock, an expert witness for TIEC, testified that, while he would have preferred that the legislature not have modified the calculation of the charge from being based on revenues to being based on volume (kWh), that change has been made and, thus, the allocation of the charge needs to be uniformly modified; "like it or not, it's a kilowatt-hour based

_____

[9] At oral argument, the Cities defined "cost-causation" as "the Commission's policy of allocating costs in a non-discriminatory manner; the Commission has great discretion in this regard." At the hearing, a TIEC witness defined it as "dictat[ing] that only those customers whose energy usage determines the amount of the [franchise charge] should be required to pay [it]."

[charge]." Pollock also testified that the direct allocation based on kWh method is consistent with cost-causation principles.

The record reflects substantial evidence upon which the Commission could determine that the allocation of TXU's franchise charges should be based on kWh sales. Furthermore, the statute is silent on the proper method of allocation, the Commission's chosen method parallels the calculation set forth in section 33.008, the Commission has broad discretion over rate design issues, and the record reflects that a "process of discussion, careful consideration, and compromise" occurred here. Given these facts, Nucor has failed to show that the Commission's order allocating the franchise charges based on kWh was arbitrary and capricious, characterized by an abuse of discretion, or in violation of a statute or constitution. *See Pedernales Elec. Coop.*, 809 S.W.2d at 341. Nucor's challenge to the direct allocation based on kWh is overruled.

**Spread Collection**

Nucor claims that, because franchise charges are incurred only on municipal sales and non-municipal customers do not benefit from the purpose served by the franchise charge, it was an abuse of discretion and a violation of section 33.006 for the Commission to order that TXU collect its franchise charges from both municipal and non-municipal customers.[10] Nucor's challenge to the spread collection method is primarily based on its claim that the franchise charge is a "tax" that

---

[10] Nucor also challenged the spread collection method on the ground that transmission-only customers (such as Nucor) should not be responsible for the franchise charges because section 33.008 states that the charges are to be calculated based on sale of "distribution service." Given that the statute defines "distribution service" as "the delivery of electricity to all retail customers," however, Nucor conceded at oral argument that it was included in this definition and therefore abandoned this argument. *See* Tex. Util. Code. Ann. § 33.008 (West Supp. 2004-05).

14

should not be paid by non-municipal customers who do not benefit from its collection. Nucor claims that, by allowing TXU to collect a portion of the franchise charge from non-municipal customers, the Commission's order forces non-municipal customers (such as Nucor) to subsidize municipal activities, resulting in "taxation without representation."

Appellees counter that the franchise charge is not a tax but is, instead, akin to a "rental fee," which TXU pays in exchange for the ability to locate its electric lines on municipal streets, alleys, and public rights-of-way. Appellees urge that there is substantial evidence in the record to support the Commission's determination that all customers benefit from the purpose served by the charge and, hence, that all customers should share responsibility for the cost.

Much of the debate over the nature of the charge—whether it is a tax or a rental fee—stems from the use of imprecise nomenclature. Historically, the phrase "local gross receipts tax" was used to describe the money that municipalities could collect from utilities for locating their electric facilities on municipal property. This was set forth in the tax code. *See* Tex. Tax Code Ann. § 182.025. As of 1999, however, the legislature determined that it was more appropriate to refer to these fees as "franchise charges" and to include them in the utilities code. PURA section 33.008, titled "Franchise Charges," was therefore enacted, expressly stating that the purpose was "a reasonable charge . . . for the use of a municipal street, alley, or public way to deliver electricity to a retail customer" and that the "franchise charges authorized by this section shall be considered a reasonable and necessary operating expense of each electric utility . . . ." Tex. Util. Code Ann. § 33.008(a), (c). Despite this clear legislative expression that the nature of the franchise charge is a fee, not a tax, many parties continued to use the old terminology, referring to the charge as an

15

"LGRT." But simply calling the charge an LGRT does not make it so. The legislature determined the franchise charge should not be labeled as a tax and should not appear in the tax code because the charge is not imposed like a tax. Utilities only incur the charge in exchange for the use of municipal streets, alleys, and rights-of-way; if a utility does not locate its electric facilities on municipal property, it does not incur the charge. Nucor recognized this: its expert, Dennis W. Goins, testified that "while this assessment is commonly called a tax, the 'tax' nomenclature should not disguise the fundamental nature of this fee as a charge for a specific purpose," and Nucor's motion for rehearing urged that the "underlying basis for the fee" is "a charge to use city streets and public ways."

Nucor also relies on *City of Houston v. Public Utility Commission* to support its claim that the franchise charge is a tax. 656 S.W.2d 107 (Tex. App.—Austin 1983, writ ref'd n.r.e.). This Court in *City of Houston* held that there was substantial evidence to affirm a Commission order that determined, in the context of telephone rates, that LGRTs should only be collected from municipal customers because "rural" customers derive no benefits from them. *Id.* at 108-09. Appellees argue that *City of Houston* does not support Nucor's claim. First, the court merely held that the direct collection was a "reasonable means which the Commission could permissibly adopt" under those circumstances; it did not hold that direct collection was the only appropriate method or that spread collection could never be reasonable. *Id.* at 110. Here, the appellees contend that the statute is silent as to the method of collection, and Nucor has offered nothing to show that the spread method is impermissible. Second, *City of Houston* pertained to telephone rates. The court noted that it was reasonable to collect the charge from only municipal customers because they were the "predominant

16

users" of the telephone services; the same is not necessarily true with electric utilities because some of the largest industrial customers—such as Nucor—are located outside of the municipal borders. *Id.* at 111. Finally, the appellees assert that the legislature, by enacting section 33.008 with express language that the franchise charges are "operating expenses," rejected the "tax" argument advanced in *City of Houston*.

In addition to rebutting Nucor's argument that the franchise charge is an "impermissible tax," the appellees offered evidence to support the spread collection method on the basis that all customers should be responsible for the charges because all customers benefit from their purpose. Section 33.008 expressly states that franchise charges are incurred by TXU to pay for its ability to locate electric lines on municipal streets, alleys, and rights-of-way. Tex. Util. Code Ann. § 33.008. Sherburne testified that all customers, whether located within or outside of the municipal borders, benefit from TXU's ability to locate its facilities in municipal areas because the electricity travels to all customers over an integrated grid and, therefore, all customers should be responsible for a portion of the costs TXU incurs in providing transmission and distribution service over these lines. TIEC and the Cities concurred with Sherburne's assessment, based on the notion that these lines do not abruptly end at the municipal border; rather, they run continuously from municipal locations to non-municipal areas.

Appellees also urged that simplicity and consistency are important factors to consider in rate design and that the spread collection method serves both of these goals because it applies a uniform policy to all customers and maintains the historical practice of collecting the fees from both

municipal and non-municipal customers. Pointing to Docket 5640,[11] Sherburne testified that, since 1984, the Commission has consistently approved these charges "as a system cost because all customers, including [Nucor], receive the benefits of the voltage support, improved power factor, and increased efficiency that the devices provide"; thus, for over twenty years, the franchise charges have been "recovered from all of TXU customers, regardless of whether the customer is located inside or outside of a taxing municipality's boundaries." The supreme court stated in *Texas Alarm and Signal Association* that, when a concept has historically been "widely accepted as a proper pattern for rate design" it "should not be discarded by the Commission without concrete data to support such a change." 603 S.W.2d at 768. The Cities argued that the Commission cannot alter its historical practice of spread collection without a geographically based cost-of-service study, which Nucor failed to provide.

Moreover, the appellees claimed that Nucor's proposal for a direct collection method would be problematic. Raymond Stanley, an expert for Texas Industries (TXI),[12] testified that the direct collection method would adversely affect municipal customers by shifting costs to them that were historically paid by non-municipal customers. Sherburne testified that Nucor's proposal "is contrary to efforts to create simple, easy to understand charges and billing mechanisms for REPs. For TXU, this suggestion would require approximately 400 different rates, one for each of the cities

---

[11] Tex. Pub. Util. Comm'n, *Application of Texas Utilities Electric Company for a Rate Increase*, Docket No. 5640, 10 Tex. P.U.C. Bull. 659, 853 (Feb. 1985) ("All of TUEC's customers are served from an integrated system; thus all customers benefit from the rights of the company to maintain its facilities on municipal property. Furthermore, it is clear that customer confusion and administrative burdens to the company would increase by virtue of [charging different rates based on geography].").

[12] TXI is not an appellee but was a participant below.

18

in which it provides a distribution service. This is obviously not simple, would create confusion and is contrary to the 'historical precedent' as stated above." Nucor's expert, Goins, acknowledged that the direct collection method would "require identifying each class' LGRT cost responsibility and developing separate LGRT cost-recovery factors by class for each taxing jurisdiction," but claimed this was a reasonable approach because it is the one used by Reliant Energy.[13] Sherburne responded that, just because one utility chooses to allocate or collect costs a certain way does not mean that all utilities are bound by that decision. He further testified that, due to the differences in utilities, the Commission has noted that allocation and collection methods should be determined on a utility-specific basis and need not be standardized among utilities.

With these competing views before it, the Commission ultimately determined that TXU's franchise charges should be collected from all customers because the purpose of the charge—TXU's ability to locate its electric facilities on municipal property—benefits both municipal and non-municipal customers. The Commission concluded that the spread collection method complied with PURA sections 33.008 and 36.008. We must not substitute our judgment for that of the Commission, and its order should be affirmed if the record demonstrates any reasonable basis for it. *City of El Paso*, 883 S.W.2d at 185.

The record evidences that the legislature intended the franchise charge to be a rental fee or an operating expense, not a tax, and that all customers derive a benefit from the service for which the charge is imposed. The record also demonstrates that implementing Nucor's direct-

---

[13] Beyond such general assertions, nothing in the record establishes the exact collection methods used by Reliant.

collection proposal would be "problematic," as found by the Commission, because it would result in different rates based on geography and would substantially deviate from the historical practice of collecting the charges from all customers, both within and outside of the municipality. Thus, substantial evidence exists upon which the Commission could determine that the franchise charges should be collected from all customers, and Nucor failed to demonstrate that the order was characterized by an abuse of discretion, was arbitrary and capricious, or was in violation of a statute or constitution. *See Pedernales Elec. Coop.*, 809 S.W.2d at 341. Nucor's challenge to the collection method is overruled.

## CONCLUSION

The Commission issued a final order adopting the ALJ's proposal for decision concluding that TXU's franchise charges should be allocated using the direct method based on kWh and collected using the spread method as part of its base rates from all customers. This order was affirmed by the district court. Because the record demonstrates substantial evidence to uphold the Commission's determinations on these rate design matters over which the Commission is afforded discretion, we affirm the judgment of the district court.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: June 23, 2005

20