TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00558-CV






John Bruce Payne, D.O., Appellant


v.


Texas State Board of Medical Examiners, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. D-1-GN-05-004400, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING



 

M E M O R A N D U M O P I N I O N



 John Bruce Payne, D.O., appeals a district court judgment affirming a final order of the
Texas Medical Board (1) revoking Payne's medical license. Payne appeals the judgment, bringing six
issues challenging the evidentiary support for the Board's revocation order and the process through
which the Board determined to impose the sanction. We will affirm the district court's judgment.


BACKGROUND

 Prior to the disciplinary proceedings at issue in this appeal, Payne was a Fort Worth-based, board-certified neurosurgeon licensed to practice medicine in the State of Texas. In 1999, Payne
performed on patient "J.F." an anterior cervical diskectomy and fusion (ACDF), a form of neck surgery
in which a disc is removed through an incision in the front of the neck and the adjacent vertebrae
are fused. Although the surgery proceeded without complications, J.F. "crashed" on the third post-operative day and had a series of strokes leading to multi-system organ failure and, ultimately, death
approximately ten days after surgery. J.F.'s sudden turn for the worse was not immediately known or
communicated to Payne, who at the time was departing Fort Worth to travel to Laredo to cover for
another neurosurgeon per prior agreement. Payne's responsibilities in Laredo prevented him from
immediately returning to Fort Worth. There is disputed evidence regarding the extent to which Payne
had made arrangements with other physicians and health care providers to oversee J.F.'s post-operative
care during Payne's absence.

 The Staff of the Board brought a disciplinary proceeding against Payne relating
to his treatment of J.F. Staff did not allege that Payne caused J.F.'s death or that the manner in which
Payne performed the surgery itself was deficient. Instead, Staff complained that Payne performed
the surgery when it "was not indicated or was unnecessary." The Staff also alleged deficiencies
in Payne's post-operative care of J.F., including over-medication and failure to make adequate
arrangements for coverage by other physicians during Payne's Laredo trip. Staff pled that Payne's
actions constituted violations of the Medical Practice Act's prohibitions against practicing medicine in
a manner inconsistent with the public health and welfare, unprofessional or dishonorable conduct
likely to harm the public, prescribing or administering drugs in a manner that was non-therapeutic,
and prescribing dangerous drugs or controlled substances in a manner inconsistent with public
health and welfare. See Tex. Occ. Code Ann. §§ 164.051(a)(6) (failure "to practice medicine in an
acceptable professional manner consistent with public health and welfare"), .052(a)(5) ("commit[ting]
unprofessional or dishonorable conduct that is likely to deceive, defraud or injure the public"),
.053(a)(5) (defining "unprofessional or dishonorable conduct" to include administering non-therapeutic
treatment), .053(a)(6) (defining "unprofessional or dishonorable conduct" to include prescription of
dangerous drugs or controlled substances in a manner inconsistent with public health and welfare)
(West 2004 & Supp. 2008). Staff requested that Payne's medical license be revoked.

 A contested case hearing on the complaint was held before an administrative law judge
(ALJ) at the State Office of Administrative Hearings (SOAH). The hearing spanned four days. It was
largely a battle of medical experts: a total of twelve physicians testified either live or by deposition, and
seventeen physicians' reports were admitted into evidence. Following the hearing, the ALJ issued a
proposal for decision with proposed findings of fact and conclusions of law. The ALJ concluded that
Payne had violated each of the Medical Practice Act provisions that Staff had alleged.

 Regarding the allegation that J.F.'s surgery had not been necessary or indicated, the ALJ
made findings to the effect that Payne had decided to perform surgery based on inadequate objective
medical data and solely his own impressions of available data that were uncorroborated by (and/or
inconsistent with) other physicians' interpretations. As for the over-medication allegation, the ALJ
found that Payne had authorized hospital nurses to administer between two and four times the proper
dosage of OxyContin (a type of pain medication) to J.F. during his post-operative recovery. On the
other hand, the ALJ also found that hospital nurses, without Payne's awareness, had compounded
the problem by crushing the pills (which eliminates the time-release qualities of the drug) and
administering the prescribed dose more frequently than Payne had directed. Concerning the coverage
issue, the ALJ found that Payne had failed to act with proper diligence in making coverage
arrangements for J.F.'s post-operative care during Payne's trip to Laredo, including by failing to clearly
specify the arrangements and the patient's needs with the physicians involved and with hospital staff. 
The ALJ further found that a physician "poses a level of potential harm to the public" if he "performs
surgery before eliminating more conservative forms of therapy," "performs surgery based on insufficient
diagnostic results," "prescribes drugs in a non-therapeutic manner," or "fails to provide reliable post-surgical coverage for his patients during his absence." Based on these findings, the ALJ made the
following findings of ultimate fact: 

139. In his treatment of J.F., Dr. Payne performed surgery before eliminating more
conservative forms of therapy and thereby poses a level of potential harm to
the public.


140. In his treatment of J.F., Dr. Payne performed surgery based on insufficient
diagnostic results and thereby poses a level of potential harm to the public.


141. In his treatment of J.F., Dr. Payne prescribed drugs in a non-therapeutic
manner and thereby poses a level of potential harm to the public.


142. In his treatment of J.F., Dr. Payne failed to provide reliable post-surgical
coverage for his patients during his absence and thereby poses a level of
potential harm to the public.



Based on its fact findings, the ALJ made the following pertinent conclusions of law:


9. Dr. Payne did not adhere to the standard of care in his treatment of J.F. and
thus violated Sections 164.051(a)(6) (failure to practice in an acceptable
professional manner), 164.052(a)(5) (engaging in unprofessional or
dishonorable conduct likely to deceive, defraud or injure the public), Section
164.053(a(5) (engaging in unprofessional or dishonorable conduct including
administering non-therapeutic treatment), and Section 164.053(a)(6)
(engaging in unprofessional or dishonorable conduct including the
prescription of dangerous drugs or controlled substances in a manner
inconsistent with public health and welfare).


10. In his treatment of J.F., Dr. Payne committed unprofessional and
dishonorable conduct related to the practice of medicine.


11. In his treatment of J.F., Dr. Payne failed to practice medicine in an acceptable
professional manner consistent with the public health and welfare. 


The ALJ also made findings regarding various "aggravating factors" under the Board's sanction
guidelines:


143. Dr. Payne was denied staff privileges at two hospitals in March or April
1997.


144. Dr. Payne was the subject of at least eight medical malpractice lawsuits filed
against him prior to September 1999, including one involving a patient's
death.


145. Dr. Payne was the subject of a disciplinary action in May 1999 at Plaza
Medical Center of Fort Worth.


146. After September 1999, additional claims of medical negligence were made
against Dr. Payne regarding his conduct as a spinal surgeon at Osteopathic
Medical Center of Texas.


147. Dr. Payne was required by the Board to pay two administrative fines for
failing to disclose disciplinary actions at two different hospitals.



See 22 Tex. Admin. Code §§ 190.14, .15 (2008). The ALJ recommended that the Board revoke
Payne's medical license.

 The Board adopted the ALJ's proposed findings of fact and conclusions of law in all
relevant respects. As the ALJ had recommended, the Board revoked Payne's medical license.

 After exhausting his administrative remedies before the Board, Payne sought judicial
review of the Board's final order in the district court. The district court affirmed the Board's final
order in full. Payne then appealed the district court's judgment to this Court.






STANDARD OF REVIEW

 Our review of the Board's final order is governed by the "substantial evidence"
standard of the Administrative Procedures Act. Under this standard, we may not substitute our
judgment for that of the Board on the weight of the evidence on questions committed to agency
discretion. Tex. Gov't Code Ann. § 2001.174 (West 2008). However, we must reverse and remand
the Board's order if Payne's substantial rights have been prejudiced because the Board's findings,
inferences, conclusions, or decisions (1) violate a constitutional or statutory provision; (2) exceed the
Board's statutory authority; (3) were made through unlawful procedure; (4) were affected by other
error of law; (5) are not reasonably supported by substantial evidence considering the reliable and
probative evidence in the record as a whole; or (6) are arbitrary or capricious or characterized by abuse
of discretion or clearly unwarranted exercise of discretion. Id. § 2001.174(2).

 The Board's order is presumed valid and Payne bears the burden of showing a lack
of substantial evidence. City of El Paso v. Public Util. Comm'n, 883 S.W.2d 179, 185 (Tex. 1994); 
Sportscoach Corp. of Am. v. Eastex Camper Sales, Inc., 31 S.W.3d 730, 733 (Tex. App.--Austin
2000, no pet.). We review the Board's legal conclusions for errors of law and its findings of fact
for support by substantial evidence. Heat Energy Advanced Tech., Inc. v. West Dallas Coal.,
962 S.W.2d 288, 294-95 (Tex. App.--Austin 1998, pet. denied). The crux of a substantial evidence
analysis is whether the agency's factual findings are reasonable "in light of the evidence from which
they were purportedly inferred." Granek v. Texas State Bd. of Med. Exam'rs, 172 S.W.3d 761, 778
(Tex. App.--Austin 2005, no pet.) (quoting John E. Powers, Agency Adjudications 163 (1990)). 
Substantial evidence does not mean "a large or considerable amount of evidence"; rather, substantial
evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion' of fact." Lauderdale v. Texas Dep't of Agric., 923 S.W.2d 834, 836 (Tex. App.--Austin
1996, no writ) (quoting Pierce v. Underwood, 487 U.S. 552, 564-65 (1988); Consolidated Edison
Co. v. NLRB, 305 U.S. 197, 229 (1938)). To constitute substantial evidence, the reliable and probative
evidence in its entirety must be sufficient that reasonable minds could have reached the conclusion
that the agency must have reached to justify the disputed action. Heat Energy Advanced Tech., Inc.,
962 S.W.2d at 294-95 (citing Texas State Bd. of Dental Exam'rs v. Sizemore, 759 S.W.2d 114,
116 (Tex. 1988)). The evidence in the record may preponderate against the agency's decision and
still provide a reasonable basis for the decision and satisfy the substantial evidence standard. Id.
(citing Nucor Steel v. Public Util. Comm'n, 168 S.W.3d 260, 267 (Tex. App.--Austin 2005, no pet.)). 
The fact-finder--here, the ALJ--determines the credibility of witnesses and the weight to give
their testimony. See Granek, 172 S.W.3d at 778. We may not set aside an agency decision merely
because testimony was conflicting or disputed, or because it did not compel the agency's decision. 
Sanchez v. Texas State Bd. of Med. Exam'rs, 229 S.W.3d 498, 510 (Tex. App.--Austin 2007, no pet.)
(citing Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer, 662 S.W.2d 953, 956
(Tex. 1996)). Ultimately we are concerned not with the correctness of the agency's order, but its
reasonableness. Id.

 Whether the Board's order was supported by substantial evidence is a question of law.
Montgomery Indep. Sch. Dist. v. Davis, 34 S.W.3d 559, 562 (Tex. 2000). The district court's
judgment is thus not entitled to deference on appeal. Texas Dep't of Pub. Safety v. Alford, 209 S.W.3d
101, 103 (Tex. 2006) (per curiam). On appeal of that judgment, we consider the same question
presented to the district court: whether the Board's order was supported by substantial evidence. See
Montgomery, 34 S.W.3d at 562.

ANALYSIS


 Payne brings six issues on appeal. Although he was represented by counsel before
the Board and in the district court, he is proceeding pro se on appeal. Perhaps as a consequence, his
appellate arguments are not framed in terms of the specific findings of fact or conclusions of law that
support the Board's final order. While we must hold Payne to the same procedural and substantive
standards that we apply to represented parties, (2) we have attempted to construe fairly the substance of
his arguments and how they implicate the factual or legal underpinnings of the Board's order.

 Payne's principal complaint, the focus of his second issue, is that he was deprived of
due process before the Board because the Board's two primary experts who testified against
him--neurologist Dr. Martin Lazar and orthopedic surgeon Dr. Ralph Rashbaum--were "blatantly
biased" against him. The gravamen of Payne's complaint of "bias" is that both physicians had a
"history" with him and had come to have strong negative views of Payne's medical aptitude. For
example, Lazar had been critical of Payne's work in two previous Board investigations. In his
report in the present proceeding, which is part of the agency record, Lazar accused Payne of having
"a history of marginal indications for surgery," and condemned his decision to perform surgery on J.F.
in rather sensational terms. (3) Payne reasons that the "bias" of the Board's experts evidences a skewed
proceeding "contrary to rudiments of fair play long known to be the law." (4)

 As the Board points out, the complaint was tried to a disinterested hearing officer--an
ALJ employed by SOAH. It was the ALJ, not the Board, who heard the testimony first-hand and
assessed the credibility of the witnesses and the weight of their testimony. Payne was afforded the
trial-like procedural rights of an APA contested-case hearing, including the right to cross-examine
the Board's witnesses. Payne's counsel availed himself of that right, vigorously cross-examining
Lazar and Rashbaum on issues including their possible bias against Payne and the support for their
opinions, and there is no complaint or indication that he was deprived of that opportunity. Payne
received due process. See City of Corpus Christi v. Public Util. Comm'n of Tex., 51 S.W.3d 231, 262
(Tex. 2001); Rector v. Texas Alcoholic Beverage Comm'n, 599 S.W.2d 800, 800-01 (Tex. 1980). 

 As it is presented to us here, Payne's complaints regarding witness "bias" and "due
process" violations are ultimately an attack on the ALJ's judgments regarding the credibility of the
experts and the weight to be afforded their testimony. Our standard of review precludes us from
second-guessing such determinations. See Granek, 172 S.W.3d at 778. (5)

 Payne also asserts that the Board manifested its "bias" through its "total denial" of its
experts' acknowledgments that Payne did not violate the standard of care in his performance of the
surgery itself and "the unjustified dismissal" of the autopsy report showing that he did not cause J.F.'s
death. He also brings separate issues complaining that the Board "capriciously and arbitrarily
disregard[ed] the testimony of even their experts which refuted the charges" (his third issue) and that it
"reject[ed] the pathologist's autopsy findings which offered the most reasonable explanation for the
patient's stroke and multisystem organ failure since it wasn't compatible with the board's charges"
(his sixth issue). Besides amounting to attacks on the ALJ's judgments regarding conflicting
evidence, Payne's complaints concern matters that were not a factual or legal basis for the Board's
revocation order. As we have previously explained, the Board's order was not based on findings that
Payne had performed the surgery deficiently or had caused J.F.'s death. Consequently, Payne's
contentions regarding those matters are simply inapposite. We overrule Payne's second, third, and
sixth issues.

 Payne also advances arguments that, in substance, challenge the findings that he
performed surgery that was not indicated, over-prescribed pain medication, and failed to make
adequate coverage arrangements for J.F.'s post-operative care while Payne was in Laredo. In his first
issue, Payne attacks the ALJ's findings that "surgery was inappropriate" on the basis that "he precisely
and professionally followed the guidelines set forth by the Texas Worker's Comp. System." Payne's
complaint implicates the following fact findings:


24. Dr. Payne recommended surgery for J.F.'s condition.


25. Because J.F.'s injuries were covered by workers' compensation insurance,
Dr. Payne was required to obtain a second, confirming surgical opinion.


26. The physician who was chosen to provide that second opinion was Ralph
Saunders, M.D.


27. Dr. Saunders is a board-certified orthopedic surgeon who has been in practice
since 1989 with experience in cervical and lumbar surgery.


28. Dr. Saunders did not recommend surgery.


29. Dr. Saunders found that: (1) the imaging studies and the physical
examination [previously performed on J.F.] did not sustain the need for
surgery; and (2) other forms of therapy and other diagnostic studies should
continue to be performed.


30. Dr. Payne wrote a letter of complaint to the Texas Workers' Compensation
Commission (TWCC) on July 16, 1999, alleging that Dr. Saunders failed to
perform a thorough examination of J.F.


31. TWCC agreed to allow J.F. to obtain a third pre-surgical opinion.


32. On August 10, 1999, J.F. was examined by Joe Ellis Wheeler, M.D., a
neurologist.


33. Dr. Wheeler's report did not provide significant additional medical
information or medical insight upon which to base a conclusion about J.F.'s
need for surgery.


34. Dr. Wheeler concurred with Dr. Payne's recommendation for an anterior
cervical diskectomy and fusion (ACDF) surgical procedure for J.F.


35. On September 1, 1999, TWCC notified J.F. that his surgery had been
approved.

 

Essentially, Payne reasons that because TWCC pre-authorized the surgery for worker's compensation
coverage purposes, the ALJ's findings that the surgery was not indicated by objective
testing data or clinical examination was arbitrary, unreasonable, and not supported by substantial
evidence. However, the ALJ made extensive findings regarding the entirety of objective
medical data available to Payne when making his decision to perform surgery. It found that
Payne acted upon inadequate objective data and/or relied on his own idiosyncratic
impressions of that data that were inconsistent with the interpretations of other physicians. (6)
The ALJ also found that the second opinion on which TWCC based its authorization, that of
Dr. Wheeler, "did not provide significant additional medical information or medical insight upon
which to base a conclusion about J.F.'s need for surgery." Payne has not met his burden of
demonstrating that these findings of underlying fact are not supported by substantial evidence. The
findings, in turn, support the ALJ's ultimate findings that Payne "performed surgery before eliminating
more conservative forms of therapy and thereby poses a level of potential harm to the public," and
"performed surgery based on insufficient diagnostic results and thereby poses a level of potential harm
to the public." We overrule Payne's first issue.

 In his fifth issue, Payne complains that the Board "disregarded the fact that the nurses
may have accidentally overdosed the patient acknowledged by the judge leading to his stroke and
multisystem organ failure in order to reach their desired decision." This argument implicates the
following relevant fact findings:



117. J.F. received a tremendous amount of pain medication after his surgery,
including Stadol, Percocet, Flexeril, OxyContin, Demerol, and Valium.


118. Dr. Payne authorized the nurses to administer OxyContin to J.F. every twelve
hours at 40 mg. per dose.


119. The dosage of OxyContin should have been diminished to 10-20 mg. every
twelve hours, a half to a third of the standard dose if J.F. was receiving other
opioids concurrently.


120. J.F. was receiving other opioids concurrently with OxyContin.


121. On September 24, 1999, the nursing staff administered one dose of
OxyContin to J.F. at 8:00 p.m. and another at 9:30 p.m., a time period that
was in violation of Dr. Payne's orders.


122. The hospital nursing staff did not contact Dr. Payne to tell him about the
medication administration error.


123. The hospital nurses crushed the OxyContin pills to make them easier for J.F.
to swallow.


124. The crushing of OxyContin eliminates the time release qualities of the drug,
so that the entire amount of the drug affects the patient much more quickly
than prescribed.


125. Dr. Payne was unaware that the hospital nursing staff was crushing the
OxyContin pills.



Payne emphasizes that the ALJ found the nurses, and not he, to be at fault for the September 24,
1999 administration error and for crushing the OxyContin pills. However, it remains that the ALJ
independently found that Payne had prescribed double or quadruple the proper dosage of OxyContin
for J.F. Payne has not met his burden of establishing that this finding is not supported by substantial
evidence. The finding that Payne had over-prescribed OxyContin, in turn, supports the ultimate
finding that Payne "prescribed drugs in a non-therapeutic manner and thereby poses a level of
potential harm to the public."

 Similar to the arguments in his third and sixth issues, Payne urges that the nurses'
over-medication of J.F. and not his actions caused the patient's death. As we have explained, the
question of whether Payne, the nurses, or something else caused J.F.'s death is irrelevant because
the Board's order was based on findings unrelated to whether Payne had caused J.F.'s death. We
overrule Payne's fifth issue.

 Payne also argues in his brief that "[t]here was substantial evidence to confirm that
Dr. Trey Fulp was asked to cover for Dr. Payne." He cites "a note on [J.F.'s] chart and Dr. Gregory
Smith admitted as much during the hearing by stating that he heard Dr. Fulp admit that he was
covering." The ALJ, in fact, found that "Dr. Payne understood that Trey Fulp, O.D., an orthopedic
surgeon, had agreed to cover his two hospitalized patients and that Dr. Smith had agreed to cover
any of Dr. Payne's new patients," but that "[n]either Dr. Fulp nor Dr. Smith understood that they
were providing coverage for J.F. for Dr. Payne." The evidence on this point is conflicting, and we
cannot say that the ALJ acted unreasonably in resolving the conflict.

 Finally, in his fourth issue, Payne complains that the Board "distort[ed] and
exaggerate[d] his malpractice history and peer review history to the administrative judge without
presenting the true facts and circumstances that were used in the judge's decision from the Findings
of Fact." We have reviewed the record and cannot conclude that the ALJ's findings on these issues
were not supported by substantial evidence or that the Board lacked a reasonable basis for imposing
the sanction it chose. We overrule Payne's fourth issue. 


CONCLUSION


 Having overruled all of Payne's issues on appeal, we affirm the district court's
judgment.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: March 12, 2009
1. Effective September 1, 2005, the Texas State Board of Medical Examiners was renamed
the Texas Board of Medical Examiners. See Act of May 17, 2005, 79th Leg., R.S., ch. 269, §§ 1.01-.03, 5.01, 2005 Tex. Gen. Laws 720 (current version at Tex. Occ. Code Ann. §§ 151.002, 152.001
(West Supp. 2008)). This change took effect after the ALJ issued its proposal for decision in this
case but before the agency issued its final order. We will refer to the agency simply as "the Board"
for clarity.
2. See Mansfield State Bank v. Cohn, 573 S.W.2d 181, 184-85 (Tex. 1978).
3. Among other things, Lazar accused Payne of "misrepresenting" clinical findings, "flagrant
over treatment of patients," "complete disregard of the patient's well being," "behavior . . . either
based upon profound medical stupidity or larceny," and "fraud." Lazar further termed Payne "a
menace to his community." Payne counters in his brief by attacking Lazar's "inflammatory,
outlandish, and unprofessional comments." 
4. To further support his contentions that the bias of Lazar and Rashbaum deprived him of
due process, Payne has moved to supplement the appellate record with what he regards as additional
proof of that bias: (1) Lazar's investigative report in this proceeding; (2) Lazar's investigative report
in another Board proceeding involving four other patients, in which he concludes that Payne had
"flagrantly overtreated these patients"; (3) deposition testimony from an unrelated civil case in which
a fellow Fort Worth physician who had practiced with Payne, Dr. Trey Fulp (the same physician with
whom Payne had claimed to have made coverage arrangements during his Laredo trip), indicated that
Rashbaum had expressed unfavorable views about Payne's work to him. Lazar's report from this
proceeding, as noted, is already part of the agency record. As for the additional materials, our review
is confined to the record on which the agency based its decision. See Granek v. Texas State Bd. of
Med. Exam'rs, 172 S.W.3d 761, 778 (Tex. App.--Austin 2005, no pet.). Payne attempts to invoke
section 2001.175 of the APA, which permits a trial court in an administrative appeal to "receive
evidence of procedural irregularities alleged to have occurred before the agency that are not reflected
in the record," and to remand the proceeding back to the agency to consider additional evidence
when "the additional evidence is material and that there were good reasons for the failure to present
it in the [agency] proceedings." Tex. Gov't Code Ann. § 2001.175(c)-(e) (West 2008). However,
Payne did not request the district court to remand the case back to the Board for consideration of
additional evidence, nor is there any indication in the record that he presented the evidence to the
district court. Furthermore, Payne acknowledges the additional materials merely "amplify" evidence
already before the ALJ concerning the alleged bias of Lazar and Rashbaum. We overrule Payne's
motion to supplement the administrative record.
5. We note that, after the Board's final order in this case, it adopted rules to limit "conflicts
of interest" among the physician experts it utilizes to review complaints involving physician
competency issues. 30 Tex. Reg. 7139 (2005), adopted 31 Tex. Reg. 393 (2006) (codified at
22 Tex. Admin Code §§ 182.3-.5, .7, .8). These conflicts include a reviewer's personally knowing
a physician who is the subject of a complaint if the physician and reviewer practice medicine in the
same geographic market, and having "knowledge of information that has not been provided by the
Board and that the Reviewer cannot set aside that knowledge and fairly and impartially consider
the matter based solely on the information provided by the Board." See id. § 182.8(a)(2)(A), (B)(iii). 
We express no opinion regarding the implications of these rules if they had applied in this
proceeding.
6. Among other facts, the ALJ found:


88. The objective medical tests available to Dr. Payne when he decided to perform
surgery on J.F. were the MRI of March 3, 1999, the EMG/NCV of May 4, 1999, and
the myelogram and post myelogram CT of May 11, 1999.

 

89. Dr. Payne's March 26, 1999, conclusions from his reading of the MRI films were
different from those of Dr. Maley, the radiologist who performed the MRI.

90. Dr. Payne's conclusions about the results of the EMG/NCV were different from
those of Dr. Blair, the neurologist who performed the test.


91. The myelogram films were of such poor quality that they were completely
uninterpretable.


92. Dr. Payne concluded that the myelogram provided evidence of significant
degenerative changes with compression on the nerve roots.


93. A post-myelogram CT provides the most thorough visual information about a
patient's neurological condition.


94. The radiologists' post-myelogram CT study failed to discuss the status of J.F.'s
spine at the proposed surgical site, C4-5.


95. The study's conclusions about the condition of the other cervical spine disclosed
no significant pathology, and the radiology report concluded that the results showed
an otherwise unremarkable cervical spine CT post-myelogram.


96. Dr. Payne referred to the study in his hospital admission records as additional
evidence of J.F.'s nerve root compression.


97. The post-myelogram CT study showed that J.F.'s cervical spine had mild
stenosis but was not sufficiently narrow to prevent the nerve roots from performing.


98. The post-myelogram CT study showed some impingement by osteophytes or
disk protusion but not of sufficient quality to affect the cord or its nerves.


99. J.F.'s pain ranged from moderate to severe and emerged at various times in his
back, arms, shoulders, and face.


100. The medically significant determinant for pathology based on medical tests was
whether the spinal cord or nerve root suffered to the degree that the cerebral spinal
fluid (CSF) was obscured from view.


101. Although pain is one determinant among clinical findings, it is not the only
determinant.


102. Muscle weakness and muscle atrophy reflect the progression of the disease
process, but neither condition defines the pathology nor confirms surgery as the most
appropriate therapy.


103. J.F.'s cervical spinal cord was impinged at the C4-5 level but not to the point
that the CSF was prevented from surrounding the cord or preventing the cord from
performing its function.


104. J.F.'s foramina at the C4-5 level were affected by stenosis, but the narrowing
was not sufficient to prevent the nerve roots from exiting.


105. J.F.'s nerve roots at C4-5 were surrounded by CSF.


106. J.F.'s pain was a confirming indicator that he was suffering from some sort of
significant and ongoing neurological problem.


107. ACDF is a commonly performed surgical procedure and is widely regarded as
an appropriate therapy to address the type of pain suffered by J.F.


108. Dr. Payne had an obligation to consider surgery based not only on the requests
of his patient but also based on the standards of professional practice.


109. Those standards that Dr. Payne exercise a level of caution in relying upon his
own conclusions about the diagnostic tests and clinical observations.