# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00558-CV

**John Bruce Payne, D.O., Appellant**

**v.**

**Texas State Board of Medical Examiners, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
NO. D-1-GN-05-004400, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

John Bruce Payne, D.O., appeals a district court judgment affirming a final order of the Texas Medical Board[1] revoking Payne's medical license. Payne appeals the judgment, bringing six issues challenging the evidentiary support for the Board's revocation order and the process through which the Board determined to impose the sanction. We will affirm the district court's judgment.

## BACKGROUND

Prior to the disciplinary proceedings at issue in this appeal, Payne was a Fort Worth-based, board-certified neurosurgeon licensed to practice medicine in the State of Texas. In 1999, Payne

---

[1] Effective September 1, 2005, the Texas State Board of Medical Examiners was renamed the Texas Board of Medical Examiners. *See* Act of May 17, 2005, 79th Leg., R.S., ch. 269, §§ 1.01-.03, 5.01, 2005 Tex. Gen. Laws 720 (current version at Tex. Occ. Code Ann. §§ 151.002, 152.001 (West Supp. 2008)). This change took effect after the ALJ issued its proposal for decision in this case but before the agency issued its final order. We will refer to the agency simply as "the Board" for clarity.

performed on patient "J.F." an anterior cervical diskectomy and fusion (ACDF), a form of neck surgery in which a disc is removed through an incision in the front of the neck and the adjacent vertebrae are fused. Although the surgery proceeded without complications, J.F. "crashed" on the third post-operative day and had a series of strokes leading to multi-system organ failure and, ultimately, death approximately ten days after surgery. J.F.'s sudden turn for the worse was not immediately known or communicated to Payne, who at the time was departing Fort Worth to travel to Laredo to cover for another neurosurgeon per prior agreement. Payne's responsibilities in Laredo prevented him from immediately returning to Fort Worth. There is disputed evidence regarding the extent to which Payne had made arrangements with other physicians and health care providers to oversee J.F.'s post-operative care during Payne's absence.

The Staff of the Board brought a disciplinary proceeding against Payne relating to his treatment of J.F. Staff did not allege that Payne caused J.F.'s death or that the manner in which Payne performed the surgery itself was deficient. Instead, Staff complained that Payne performed the surgery when it "was not indicated or was unnecessary." The Staff also alleged deficiencies in Payne's post-operative care of J.F., including over-medication and failure to make adequate arrangements for coverage by other physicians during Payne's Laredo trip. Staff pled that Payne's actions constituted violations of the Medical Practice Act's prohibitions against practicing medicine in a manner inconsistent with the public health and welfare, unprofessional or dishonorable conduct likely to harm the public, prescribing or administering drugs in a manner that was non-therapeutic, and prescribing dangerous drugs or controlled substances in a manner inconsistent with public health and welfare. *See* Tex. Occ. Code Ann. §§ 164.051(a)(6) (failure "to practice medicine in an acceptable professional manner consistent with public health and welfare"), .052(a)(5) ("commit[ting]

2

unprofessional or dishonorable conduct that is likely to deceive, defraud or injure the public"), .053(a)(5) (defining "unprofessional or dishonorable conduct" to include administering non-therapeutic treatment), .053(a)(6) (defining "unprofessional or dishonorable conduct" to include prescription of dangerous drugs or controlled substances in a manner inconsistent with public health and welfare) (West 2004 & Supp. 2008). Staff requested that Payne's medical license be revoked.

A contested case hearing on the complaint was held before an administrative law judge (ALJ) at the State Office of Administrative Hearings (SOAH). The hearing spanned four days. It was largely a battle of medical experts: a total of twelve physicians testified either live or by deposition, and seventeen physicians' reports were admitted into evidence. Following the hearing, the ALJ issued a proposal for decision with proposed findings of fact and conclusions of law. The ALJ concluded that Payne had violated each of the Medical Practice Act provisions that Staff had alleged.

Regarding the allegation that J.F.'s surgery had not been necessary or indicated, the ALJ made findings to the effect that Payne had decided to perform surgery based on inadequate objective medical data and solely his own impressions of available data that were uncorroborated by (and/or inconsistent with) other physicians' interpretations. As for the over-medication allegation, the ALJ found that Payne had authorized hospital nurses to administer between two and four times the proper dosage of OxyContin (a type of pain medication) to J.F. during his post-operative recovery. On the other hand, the ALJ also found that hospital nurses, without Payne's awareness, had compounded the problem by crushing the pills (which eliminates the time-release qualities of the drug) and administering the prescribed dose more frequently than Payne had directed. Concerning the coverage issue, the ALJ found that Payne had failed to act with proper diligence in making coverage arrangements for J.F.'s post-operative care during Payne's trip to Laredo, including by failing to clearly

3

specify the arrangements and the patient's needs with the physicians involved and with hospital staff. The ALJ further found that a physician "poses a level of potential harm to the public" if he "performs surgery before eliminating more conservative forms of therapy," "performs surgery based on insufficient diagnostic results," "prescribes drugs in a non-therapeutic manner," or "fails to provide reliable post-surgical coverage for his patients during his absence." Based on these findings, the ALJ made the following findings of ultimate fact:

139. In his treatment of J.F., Dr. Payne performed surgery before eliminating more conservative forms of therapy and thereby poses a level of potential harm to the public.

140. In his treatment of J.F., Dr. Payne performed surgery based on insufficient diagnostic results and thereby poses a level of potential harm to the public.

141. In his treatment of J.F., Dr. Payne prescribed drugs in a non-therapeutic manner and thereby poses a level of potential harm to the public.

142. In his treatment of J.F., Dr. Payne failed to provide reliable post-surgical coverage for his patients during his absence and thereby poses a level of potential harm to the public.

Based on its fact findings, the ALJ made the following pertinent conclusions of law:

9. Dr. Payne did not adhere to the standard of care in his treatment of J.F. and thus violated Sections 164.051(a)(6) (failure to practice in an acceptable professional manner), 164.052(a)(5) (engaging in unprofessional or dishonorable conduct likely to deceive, defraud or injure the public), Section 164.053(a(5) (engaging in unprofessional or dishonorable conduct including administering non-therapeutic treatment), and Section 164.053(a)(6) (engaging in unprofessional or dishonorable conduct including the prescription of dangerous drugs or controlled substances in a manner inconsistent with public health and welfare).

10. In his treatment of J.F., Dr. Payne committed unprofessional and dishonorable conduct related to the practice of medicine.

4

11. In his treatment of J.F., Dr. Payne failed to practice medicine in an acceptable professional manner consistent with the public health and welfare.

The ALJ also made findings regarding various "aggravating factors" under the Board's sanction guidelines:

143. Dr. Payne was denied staff privileges at two hospitals in March or April 1997.

144. Dr. Payne was the subject of at least eight medical malpractice lawsuits filed against him prior to September 1999, including one involving a patient's death.

145. Dr. Payne was the subject of a disciplinary action in May 1999 at Plaza Medical Center of Fort Worth.

146. After September 1999, additional claims of medical negligence were made against Dr. Payne regarding his conduct as a spinal surgeon at Osteopathic Medical Center of Texas.

147. Dr. Payne was required by the Board to pay two administrative fines for failing to disclose disciplinary actions at two different hospitals.

*See* 22 Tex. Admin. Code §§ 190.14, .15 (2008). The ALJ recommended that the Board revoke Payne's medical license.

The Board adopted the ALJ's proposed findings of fact and conclusions of law in all relevant respects. As the ALJ had recommended, the Board revoked Payne's medical license.

After exhausting his administrative remedies before the Board, Payne sought judicial review of the Board's final order in the district court. The district court affirmed the Board's final order in full. Payne then appealed the district court's judgment to this Court.

## STANDARD OF REVIEW

Our review of the Board's final order is governed by the "substantial evidence" standard of the Administrative Procedures Act. Under this standard, we may not substitute our judgment for that of the Board on the weight of the evidence on questions committed to agency discretion. Tex. Gov't Code Ann. § 2001.174 (West 2008). However, we must reverse and remand the Board's order if Payne's substantial rights have been prejudiced because the Board's findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision; (2) exceed the Board's statutory authority; (3) were made through unlawful procedure; (4) were affected by other error of law; (5) are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (6) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id.* § 2001.174(2).

The Board's order is presumed valid and Payne bears the burden of showing a lack of substantial evidence. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Sportscoach Corp. of Am. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 733 (Tex. App.—Austin 2000, no pet.). We review the Board's legal conclusions for errors of law and its findings of fact for support by substantial evidence. *Heat Energy Advanced Tech., Inc. v. West Dallas Coal.*, 962 S.W.2d 288, 294-95 (Tex. App.—Austin 1998, pet. denied). The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable "in light of the evidence from which they were purportedly inferred." *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.) (quoting John E. Powers, Agency Adjudications 163 (1990)). Substantial evidence does not mean "a large or considerable amount of evidence"; rather, substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a

6

conclusion' of fact." *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988); *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To constitute substantial evidence, the reliable and probative evidence in its entirety must be sufficient that reasonable minds could have reached the conclusion that the agency must have reached to justify the disputed action. *Heat Energy Advanced Tech., Inc.*, 962 S.W.2d at 294-95 (citing *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988)). The evidence in the record may preponderate against the agency's decision and still provide a reasonable basis for the decision and satisfy the substantial evidence standard. *Id.* (citing *Nucor Steel v. Public Util. Comm'n*, 168 S.W.3d 260, 267 (Tex. App.—Austin 2005, no pet.)). The fact-finder—here, the ALJ—determines the credibility of witnesses and the weight to give their testimony. *See Granek*, 172 S.W.3d at 778. We may not set aside an agency decision merely because testimony was conflicting or disputed, or because it did not compel the agency's decision. *Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 510 (Tex. App.—Austin 2007, no pet.) (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1996)). Ultimately we are concerned not with the correctness of the agency's order, but its reasonableness. *Id.*

Whether the Board's order was supported by substantial evidence is a question of law. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000). The district court's judgment is thus not entitled to deference on appeal. *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal of that judgment, we consider the same question presented to the district court: whether the Board's order was supported by substantial evidence. *See Montgomery*, 34 S.W.3d at 562.

7

**ANALYSIS**

Payne brings six issues on appeal. Although he was represented by counsel before the Board and in the district court, he is proceeding pro se on appeal. Perhaps as a consequence, his appellate arguments are not framed in terms of the specific findings of fact or conclusions of law that support the Board's final order. While we must hold Payne to the same procedural and substantive standards that we apply to represented parties,[2] we have attempted to construe fairly the substance of his arguments and how they implicate the factual or legal underpinnings of the Board's order.

Payne's principal complaint, the focus of his second issue, is that he was deprived of due process before the Board because the Board's two primary experts who testified against him—neurologist Dr. Martin Lazar and orthopedic surgeon Dr. Ralph Rashbaum—were "blatantly biased" against him. The gravamen of Payne's complaint of "bias" is that both physicians had a "history" with him and had come to have strong negative views of Payne's medical aptitude. For example, Lazar had been critical of Payne's work in two previous Board investigations. In his report in the present proceeding, which is part of the agency record, Lazar accused Payne of having "a history of marginal indications for surgery," and condemned his decision to perform surgery on J.F.

---

[2] *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184-85 (Tex. 1978).

in rather sensational terms.[3] Payne reasons that the "bias" of the Board's experts evidences a skewed proceeding "contrary to rudiments of fair play long known to be the law."[4]

As the Board points out, the complaint was tried to a disinterested hearing officer—an ALJ employed by SOAH. It was the ALJ, not the Board, who heard the testimony first-hand and assessed the credibility of the witnesses and the weight of their testimony. Payne was afforded the trial-like procedural rights of an APA contested-case hearing, including the right to cross-examine the Board's witnesses. Payne's counsel availed himself of that right, vigorously cross-examining

---

[3] Among other things, Lazar accused Payne of "misrepresenting" clinical findings, "flagrant over treatment of patients," "complete disregard of the patient's well being," "behavior . . . either based upon profound medical stupidity or larceny," and "fraud." Lazar further termed Payne "a menace to his community." Payne counters in his brief by attacking Lazar's "inflammatory, outlandish, and unprofessional comments."

[4] To further support his contentions that the bias of Lazar and Rashbaum deprived him of due process, Payne has moved to supplement the appellate record with what he regards as additional proof of that bias: (1) Lazar's investigative report in this proceeding; (2) Lazar's investigative report in another Board proceeding involving four other patients, in which he concludes that Payne had "flagrantly overtreated these patients"; (3) deposition testimony from an unrelated civil case in which a fellow Fort Worth physician who had practiced with Payne, Dr. Trey Fulp (the same physician with whom Payne had claimed to have made coverage arrangements during his Laredo trip), indicated that Rashbaum had expressed unfavorable views about Payne's work to him. Lazar's report from this proceeding, as noted, is already part of the agency record. As for the additional materials, our review is confined to the record on which the agency based its decision. *See Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.). Payne attempts to invoke section 2001.175 of the APA, which permits a trial court in an administrative appeal to "receive evidence of procedural irregularities alleged to have occurred before the agency that are not reflected in the record," and to remand the proceeding back to the agency to consider additional evidence when "the additional evidence is material and that there were good reasons for the failure to present it in the [agency] proceedings." Tex. Gov't Code Ann. § 2001.175(c)-(e) (West 2008). However, Payne did not request the district court to remand the case back to the Board for consideration of additional evidence, nor is there any indication in the record that he presented the evidence to the district court. Furthermore, Payne acknowledges the additional materials merely "amplify" evidence already before the ALJ concerning the alleged bias of Lazar and Rashbaum. We overrule Payne's motion to supplement the administrative record.

Lazar and Rashbaum on issues including their possible bias against Payne and the support for their opinions, and there is no complaint or indication that he was deprived of that opportunity. Payne received due process. *See City of Corpus Christi v. Public Util. Comm'n of Tex.*, 51 S.W.3d 231, 262 (Tex. 2001); *Rector v. Texas Alcoholic Beverage Comm'n*, 599 S.W.2d 800, 800-01 (Tex. 1980).

As it is presented to us here, Payne's complaints regarding witness "bias" and "due process" violations are ultimately an attack on the ALJ's judgments regarding the credibility of the experts and the weight to be afforded their testimony. Our standard of review precludes us from second-guessing such determinations. *See Granek*, 172 S.W.3d at 778.[5]

Payne also asserts that the Board manifested its "bias" through its "total denial" of its experts' acknowledgments that Payne did not violate the standard of care in his performance of the surgery itself and "the unjustified dismissal" of the autopsy report showing that he did not cause J.F.'s death. He also brings separate issues complaining that the Board "capriciously and arbitrarily disregard[ed] the testimony of even their experts which refuted the charges" (his third issue) and that it "reject[ed] the pathologist's autopsy findings which offered the most reasonable explanation for the patient's stroke and multisystem organ failure since it wasn't compatible with the board's charges" (his sixth issue). Besides amounting to attacks on the ALJ's judgments regarding conflicting

---

[5] We note that, after the Board's final order in this case, it adopted rules to limit "conflicts of interest" among the physician experts it utilizes to review complaints involving physician competency issues. 30 Tex. Reg. 7139 (2005), *adopted* 31 Tex. Reg. 393 (2006) (codified at 22 Tex. Admin Code §§ 182.3-.5, .7, .8). These conflicts include a reviewer's personally knowing a physician who is the subject of a complaint if the physician and reviewer practice medicine in the same geographic market, and having "knowledge of information that has not been provided by the Board and that the Reviewer cannot set aside that knowledge and fairly and impartially consider the matter based solely on the information provided by the Board." *See id.* § 182.8(a)(2)(A), (B)(iii). We express no opinion regarding the implications of these rules if they had applied in this proceeding.

evidence, Payne's complaints concern matters that were not a factual or legal basis for the Board's revocation order. As we have previously explained, the Board's order was not based on findings that Payne had performed the surgery deficiently or had caused J.F.'s death. Consequently, Payne's contentions regarding those matters are simply inapposite. We overrule Payne's second, third, and sixth issues.

Payne also advances arguments that, in substance, challenge the findings that he performed surgery that was not indicated, over-prescribed pain medication, and failed to make adequate coverage arrangements for J.F.'s post-operative care while Payne was in Laredo. In his first issue, Payne attacks the ALJ's findings that "surgery was inappropriate" on the basis that "he precisely and professionally followed the guidelines set forth by the Texas Worker's Comp. System." Payne's complaint implicates the following fact findings:

24. Dr. Payne recommended surgery for J.F.'s condition.

25. Because J.F.'s injuries were covered by workers' compensation insurance, Dr. Payne was required to obtain a second, confirming surgical opinion.

26. The physician who was chosen to provide that second opinion was Ralph Saunders, M.D.

27. Dr. Saunders is a board-certified orthopedic surgeon who has been in practice since 1989 with experience in cervical and lumbar surgery.

28. Dr. Saunders did not recommend surgery.

29. Dr. Saunders found that: (1) the imaging studies and the physical examination [previously performed on J.F.] did not sustain the need for surgery; and (2) other forms of therapy and other diagnostic studies should continue to be performed.

11

30. Dr. Payne wrote a letter of complaint to the Texas Workers' Compensation Commission (TWCC) on July 16, 1999, alleging that Dr. Saunders failed to perform a thorough examination of J.F.

31. TWCC agreed to allow J.F. to obtain a third pre-surgical opinion.

32. On August 10, 1999, J.F. was examined by Joe Ellis Wheeler, M.D., a neurologist.

33. Dr. Wheeler's report did not provide significant additional medical information or medical insight upon which to base a conclusion about J.F.'s need for surgery.

34. Dr. Wheeler concurred with Dr. Payne's recommendation for an anterior cervical diskectomy and fusion (ACDF) surgical procedure for J.F.

35. On September 1, 1999, TWCC notified J.F. that his surgery had been approved.

Essentially, Payne reasons that because TWCC pre-authorized the surgery for worker's compensation coverage purposes, the ALJ's findings that the surgery was not indicated by objective testing data or clinical examination was arbitrary, unreasonable, and not supported by substantial evidence. However, the ALJ made extensive findings regarding the entirety of objective medical data available to Payne when making his decision to perform surgery. It found that Payne acted upon inadequate objective data and/or relied on his own idiosyncratic impressions of that data that were inconsistent with the interpretations of other physicians.[6]

---

[6] Among other facts, the ALJ found:

88. The objective medical tests available to Dr. Payne when he decided to perform surgery on J.F. were the MRI of March 3, 1999, the EMG/NCV of May 4, 1999, and the myelogram and post myelogram CT of May 11, 1999.

89. Dr. Payne's March 26, 1999, conclusions from his reading of the MRI films were different from those of Dr. Maley, the radiologist who performed the MRI.

90. Dr. Payne's conclusions about the results of the EMG/NCV were different from those of Dr. Blair, the neurologist who performed the test.

91. The myelogram films were of such poor quality that they were completely uninterpretable.

92. Dr. Payne concluded that the myelogram provided evidence of significant degenerative changes with compression on the nerve roots.

93. A post-myelogram CT provides the most thorough visual information about a patient's neurological condition.

94. The radiologists' post-myelogram CT study failed to discuss the status of J.F.'s spine at the proposed surgical site, C4-5.

95. The study's conclusions about the condition of the other cervical spine disclosed no significant pathology, and the radiology report concluded that the results showed an otherwise unremarkable cervical spine CT post-myelogram.

96. Dr. Payne referred to the study in his hospital admission records as additional evidence of J.F.'s nerve root compression.

97. The post-myelogram CT study showed that J.F.'s cervical spine had mild stenosis but was not sufficiently narrow to prevent the nerve roots from performing.

98. The post-myelogram CT study showed some impingement by osteophytes or disk protusion but not of sufficient quality to affect the cord or its nerves.

99. J.F.'s pain ranged from moderate to severe and emerged at various times in his back, arms, shoulders, and face.

100. The medically significant determinant for pathology based on medical tests was whether the spinal cord or nerve root suffered to the degree that the cerebral spinal fluid (CSF) was obscured from view.

101. Although pain is one determinant among clinical findings, it is not the only determinant.

102. Muscle weakness and muscle atrophy reflect the progression of the disease process, but neither condition defines the pathology nor confirms surgery as the most appropriate therapy.

13

The ALJ also found that the second opinion on which TWCC based its authorization, that of Dr. Wheeler, "did not provide significant additional medical information or medical insight upon which to base a conclusion about J.F.'s need for surgery." Payne has not met his burden of demonstrating that these findings of underlying fact are not supported by substantial evidence. The findings, in turn, support the ALJ's ultimate findings that Payne "performed surgery before eliminating more conservative forms of therapy and thereby poses a level of potential harm to the public," and "performed surgery based on insufficient diagnostic results and thereby poses a level of potential harm to the public." We overrule Payne's first issue.

In his fifth issue, Payne complains that the Board "disregarded the fact that the nurses may have accidentally overdosed the patient acknowledged by the judge leading to his stroke and

103. J.F.'s cervical spinal cord was impinged at the C4-5 level but not to the point that the CSF was prevented from surrounding the cord or preventing the cord from performing its function.

104. J.F.'s foramina at the C4-5 level were affected by stenosis, but the narrowing was not sufficient to prevent the nerve roots from exiting.

105. J.F.'s nerve roots at C4-5 were surrounded by CSF.

106. J.F.'s pain was a confirming indicator that he was suffering from some sort of significant and ongoing neurological problem.

107. ACDF is a commonly performed surgical procedure and is widely regarded as an appropriate therapy to address the type of pain suffered by J.F.

108. Dr. Payne had an obligation to consider surgery based not only on the requests of his patient but also based on the standards of professional practice.

109. Those standards that Dr. Payne exercise a level of caution in relying upon his own conclusions about the diagnostic tests and clinical observations.

multisystem organ failure in order to reach their desired decision."  This argument implicates the following relevant fact findings:

117.	J.F. received a tremendous amount of pain medication after his surgery, including Stadol, Percocet, Flexeril, OxyContin, Demerol, and Valium.

118.	Dr. Payne authorized the nurses to administer OxyContin to J.F. every twelve hours at 40 mg. per dose.

119.	The dosage of OxyContin should have been diminished to 10-20 mg. every twelve hours, a half to a third of the standard dose if J.F. was receiving other opioids concurrently.

120.	J.F. was receiving other opioids concurrently with OxyContin.

121.	On September 24, 1999, the nursing staff administered one dose of OxyContin to J.F. at 8:00 p.m. and another at 9:30 p.m., a time period that was in violation of Dr. Payne's orders.

122.	The hospital nursing staff did not contact Dr. Payne to tell him about the medication administration error.

123.	The hospital nurses crushed the OxyContin pills to make them easier for J.F. to swallow.

124.	The crushing of OxyContin eliminates the time release qualities of the drug, so that the entire amount of the drug affects the patient much more quickly than prescribed.

125.	Dr. Payne was unaware that the hospital nursing staff was crushing the OxyContin pills.

Payne emphasizes that the ALJ found the nurses, and not he, to be at fault for the September 24, 1999 administration error and for crushing the OxyContin pills.  However, it remains that the ALJ independently found that Payne had prescribed double or quadruple the proper dosage of OxyContin for J.F.  Payne has not met his burden of establishing that this finding is not supported by substantial

15

evidence. The finding that Payne had over-prescribed OxyContin, in turn, supports the ultimate finding that Payne "prescribed drugs in a non-therapeutic manner and thereby poses a level of potential harm to the public."

Similar to the arguments in his third and sixth issues, Payne urges that the nurses' over-medication of J.F. and not his actions caused the patient's death. As we have explained, the question of whether Payne, the nurses, or something else caused J.F.'s death is irrelevant because the Board's order was based on findings unrelated to whether Payne had caused J.F.'s death. We overrule Payne's fifth issue.

Payne also argues in his brief that "[t]here was substantial evidence to confirm that Dr. Trey Fulp was asked to cover for Dr. Payne." He cites "a note on [J.F.'s] chart and Dr. Gregory Smith admitted as much during the hearing by stating that he heard Dr. Fulp admit that he was covering." The ALJ, in fact, found that "Dr. Payne understood that Trey Fulp, O.D., an orthopedic surgeon, had agreed to cover his two hospitalized patients and that Dr. Smith had agreed to cover any of Dr. Payne's new patients," but that "[n]either Dr. Fulp nor Dr. Smith understood that they were providing coverage for J.F. for Dr. Payne." The evidence on this point is conflicting, and we cannot say that the ALJ acted unreasonably in resolving the conflict.

Finally, in his fourth issue, Payne complains that the Board "distort[ed] and exaggerate[d] his malpractice history and peer review history to the administrative judge without presenting the true facts and circumstances that were used in the judge's decision from the Findings of Fact." We have reviewed the record and cannot conclude that the ALJ's findings on these issues were not supported by substantial evidence or that the Board lacked a reasonable basis for imposing the sanction it chose. We overrule Payne's fourth issue.

16

## CONCLUSION

Having overruled all of Payne's issues on appeal, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:  March 12, 2009